# United States Circuit Court of Appeals,

## FOURTH CIRCUIT.

### No. 747.

BARTON W. KUHN, Plaintiff in Error,

*versus*

FAIRMONT COAL COMPANY, Defendant in Error.

[Argued March 10, 1910.     Decided May 20, 1910.]

Before GOFF and PRITCHARD, Circuit Judges and BOYD,
District Judge.

1. MINES AND MINERALS—*Grants of Minerals and Mining Rights—
Construction—Right to Subjacent Support of Surface.*

   A deed made by the owner in fee of a tract of land con-
   veying "all the coal and mining privileges necessary and con-
   venient for the removal of the same in, upon and under" said
   land "together with the right to enter upon and under said
   land and to mine, excavate and remove all of said coal" does
   not by implication reserve the right to subjacent support of
   the surface in its original condition but on the contrary is a
   waiver or surrender of such right and the grantor cannot
   recover damages for injury to the surface resulting from the
   removal of all the coal without leaving support.

2. COURTS—*Federal Courts—Following State Decisions.*

   A federal court, although required to exercise an independent
   judgment as to the construction of a deed in the case in which
   the question is presented, will incline strongly to adopt the
   construction placed on a similar deed by the highest court of
   the state where under the ruling of the state courts such con-
   struction becomes a rule of property.

In Error to the Circuit Court of the United States for the
Northern District of West Virginia, at Clarksburg, W. Va.

Homer W. Williams (Harvey W. Harmer on the brief), for
plaintiff in error, and

John Bassel and Z. T. Vinson (Vinson & Thompson, Reese
Blizzard and Edward A. Brannon on the briefs), for defendant
in error.

NOTE : The principles decided by the Federal Court in this case were de-
cided by the Supreme Court of Appeals of West Virginia in the case of *Grif-
fin* v. *Fairmont Coal Co.* 59 W. Va. 490.—REPORTER.

Barton W. Kuhn, the plaintiff in error, instituted his action in the Circuit Court of the United States for the Northern District of West Virginia against Fairmont Coal Company, alleging in substance that the plaintiff had sold to J. N. Camden the coal under a tract of land; that by conveyance from Camden the coal had become the property of the defendant Fairmont Coal Company, and that in removing the coal the defendant had not left pillars to sustain the surface in its original position, and that by reason of its failure to leave enough coal in the ground to support the surface the surface had subsided and had been damaged by reason of the removal of the coal mentioned in the deed. The defendant craved oyer of the deed and demurred to the declaration. After argument before the Circuit Court that court sustained the demurrer on the authority of the case of *Griffin against Fairmont Coal Company,* decided by the Supreme Court of Appeals of West Virginia in November, 1905. From the decision of the Circuit Court in sustaining the demurrer and dismissing the plaintiff's declaration a writ of error was sued out and brought to this court to review the judgment of the Circuit Court in sustaining the demurrer.

PRITCHARD, Circuit Judge:

This case was heard at the November Term (1907) of this court, and, after argument, the court (in pursuance of section 6 of the Act of March 3, 1891, establishing the Circuit Court of Appeals), on its own motion, certified to the Supreme Court the question as to whether this court is bound by the decision of the Supreme Court of Appeals of West Virginia in the case of *Griffin* v. *Fairmont Coal Company,* decided by that court at its November Term (1905) and reported in 59 West Virginia, 480, in which it was held:

"1. Deeds conveying coal with right of removal should be construed in the same way as other written instruments, and the intention of the parties, as manifest by the language used in the deed itself, should govern.

"2. The vendor of land may sell and convey his coal and grant to the vendee the right to enter upon and under said land and to mine, excavate, and remove all of the coal purchased and paid for by him, and if the removal of the coal necessarily

causes the surface to subside or break, the grantor cannot be heard to complain thereof.

"3.   Where a deed conveys the coal under a tract of land, together with the right to enter upon and under said land, and to mine, excavate, and remove all of it, there is no implied reservation in such an instrument that the grantee must leave enough coal to support the surface in its original position."

The Supreme Court at its October Term (1909), passed upon the question certified, 215 U. S., 349.   Justice Harlan, who rendered the opinion of the court, in passing upon the question certified, among other things, said:

"This case is here on a question propounded under the authority of the Judiciary Act of March 3, 1891, relating to the jurisdiction of the courts of the United States, 26 Stat., 826, c. 517, sec. 6.   The facts out of which the question arises are substantially as will be now stated.

"On the twenty-first day of November, 1889, the plaintiff Kuhn, a citizen of Ohio, sold and conveyed to Camden all the coal underlying a certain tract of land in West Virginia of which he, Kuhn, was the owner in fee.   The deed contained these clauses:  'The parties of the first part do grant unto the said Johnson N. Camden all the coal and mining privileges necessary and convenient for the removal of the same, in, upon and under a certain tract or parcel of land situated in the County of Marion, on the waters of the West Fork River, bounded and described as follows, to-wit: .... Together with the right to enter upon and under said land and to mine, excavate and remove all of said coal, and to remove upon and under the said lands the coal from and under adjacent, coterminous and neighboring lands, and also the right to enter upon and under the tract of land ·hereinbefore described, and make all necessary structures, roads, ways, excavations, air-shafts, drains, drainways and openings necessary or convenient for the mining and removal of said coal and the coal from coterminous and neighboring lands to market.'

"The present action of trespass on the case was brought January 18th, 1906.   The declaration alleged that the coal covered by the above deed passed to the defendant, The Fairmont Coal Company, a West Virginia corporation, on the — day of Jan-

uary, 1906; that the plaintiff Kuhn was entitled of the right to have all his surface and other strata overlying the coal supported in its natural state either by pillars or blocks of coal or by artificial support; that on the day named the defendant company mined and removed coal from under the land, leaving, however, large blocks or pillars of coal as a means of supporting the overlying surface; that the coal company, disregarding the plaintiff's rights, did knowingly, willfully and negligently, without making any compensation therefor, or for the damage arising therefrom, mine and remove all of said blocks and pillars of coal so left, by reason whereof and because of the failure to provide any proper or sufficient artificial or other support for the overlying surface, the plaintiff's surface land, or a large portion thereof, was caused to fall; and that it was cracked, broken and rent, causing large holes and fissures to appear upon the surface and destroying the water and water courses.

"The contract under which the title to the coal originally passed was executed in West Virginia and the plaintiff's cause of action arose in that State.

"A demurrer to the declaration was sustained by the Circuit Court, an elaborate opinion being delivered by Judge Dayton, *Kuhn* v. *Fairmont Coal Company*, 152 Fed. Rep., 1013. The case was then taken upon writ of error to the Circuit Court of Appeals.

"It appears from the statement of the case made by the Circuit Court of Appeals that in the year 1902, after Kuhn's deed to Camden, one Griffin brought, in a court of West Virginia, an action, similar in all respects to the present one, against the Fairmont Coal Company, the successor of Camden. His rights arose from a deed almost identical with that executed by Kuhn to Camden. That case was ruled in favor of the Coal Company, and, subsequently, was taken to the Supreme Court of West Virginia, which announced its opinion therein in November, 1905. A petition for rehearing having been filed, the judgment was stayed. But the petition was overruled March 27, 1906, on which day, after Kuhn's suit was brought, the decision previously announced in the Griffin case became final un-

der the rules of the Supreme Court of the State. *Griffin* v. *Coal Co.*, 59 W. Va., 480.

"The contention by the Coal Company in the court below was that as the decision in the Griffin case covered, substantially the same question as the one here involved, it was the duty of the federal court to accept that decision as controlling the rights of the present parties, whatever might be its own opinion as to the law applicable to this case. The contention of Kuhn was that the Federal court was under a duty to determine the rights of the present parties upon its own independent judgment, giving to the decision in the state court only such weight as should be accorded to it according to the established principles in the law of contracts and of sound reasoning; also that the Federal court was not bound by a decision of the state court in an action of trespass on the case for a tort not involving the title to land.

"Such being the issue, the Circuit Court of Appeals, proceeding under the Judiciary Act of March 3, 1891, c. 517, have sent up the following question to be answered:

" 'Is this court bound by the decision of the Supreme Court in the case of *Griffin* v. *Fairmont Coal Company*, that being an action by the plaintiff against the defendant for damages for a tort, and this being an action for damages for a tort based on facts and circumstances almost identical, the language of the deeds with reference to the granting clause being in fact identical, that case having been decided *after* the contract upon which defendant relies was executed, *after* the injury complained of was sustained, and *after* this action was instituted?'

"There is no room for doubt as to the scope of the decision in the Griffin case. The syllabus—(p. 480) which in West Virginia is the law of the case, whatever may be the reasoning employed in the opinion of the court—is as follows: '1. Deeds conveying coal with rights of removal should be construed in the same way as other written instruments, and the intention of the parties as manifest by the language used in the deed itself should govern. 2. The vendor of land may sell and convey his coal and grant to the vendee the right to enter upon and under said land and to mine, excavate and remove all of the coal purchased and paid for by him, and if the removal of the coal nec-

essarily causes the surface to subside or break, the grantor cannot be heard to complain thereof. 3. Where a deed conveys the coal under a tract of land, together with the right to enter upon and under said land, and to mine, excavate and remove all of it, there is no implied reservation in such an instrument that the grantee must leave enough coal to support the surface in its original position. 4. It is the duty of the court to construe contracts as they are made by the parties thereto, and to give full force and effect to the language used, when it is clear, plain, simple and unambiguous. 5. It is only where the language of a contract is ambiguous and uncertain and susceptible of more than one construction, that a court may, under the well established rules of construction, interfere to reach a proper construction and make certain that which in itself is uncertain.'

"Nor can it be doubted that the point decided in the Griffin case had not been previously adjudged by the Supreme Court of that State. Counsel for the Coal Company expressly state that the question here involved was never before the legislature or courts of West Virginia until the deed involved in the Griffin case came before the Supreme Court of that State for construction; that 'until then there was no law and no local custom upon the subject in force in West Virginia;' and that 'only after the holding of the State Court in the Griffin case could it be said that the narrow question therein decided had become a rule of property in that State.'

"In this view of the case was not the Federal court bound to determine the dispute between the parties according to its own independent judgment as to what rights were acquired by them under the contract relating to the coal? If the Federal court was of opinion that the Coal Company was under a legal obligation while taking out the coal in question to use such precautions and to proceed in such way as not to destroy or materially injure the surface land, was it bound to adjudge the contrary simply because, in a *single* case, *to which Kuhn was not a party* and which was determined *after* the right of the present parties had accrued and become fixed under their contract, and *after* the injury complained of had occurred, the State court took a different view of the law? If, when the jurisdiction of the Federal court was invoked, Kuhn, the citizen of Ohio, had,

in its judgment a valid cause of action against the Coal Company for the injury of which he complained, was that court obliged to subordinate its views of the law to that expressed by the state court?

"In cases too numerous to be here cited the general subject suggested by these questions has been considered by this court. It will be both unnecessary and impracticable to enter upon an extended review of those cases. They are familiar to the profession. But in the course of this opinion we will refer to a few of them.

"The question as to the binding force of state decisions received very full consideration in *Burgess* v. *Seligman,* 107 U. S., 20, 33. After judgment in that case by the United States Circuit Court, the Supreme Court of the State rendered two judgments, each of which wâs adverse to the grounds upon which the Circuit Court had proceeded, and the contention was that this court should follow those decisions of the state court and reverse the judgment of the Circuit Court   The opinion in that case states that in order to avoid misapprehension the court had given the subject special consideration, and the extended note at the close of that opinion shows that the prior cases were all closely scrutinized by the eminent justice who wrote the opinion.   A conclusion was reached that received the approval of all the members of the court.   *   *   *   In *Bucher* v. *Cheshire Railroad Co.,* 125 U. S., 555, 584, Mr. Justice Miller, speaking for the court, observed (p. 584) : 'It may be said generally that wherever the decisions of the state courts relate to some law of a local character, which may have become established by those courts, or has always been a part of the law of the State, that the decisions upon the subject are usually conclusive, and always entitled to the highest respect of the Federal courts.   The whole of this subject has recently been very ably reviewed in the case of *Burgess* v. *Seligman,* 107 U. S., 20. Where such local law or custom has been established by repeated decisions of the highest courts of a State, it becomes also the law governing the courts of the United States sitting in that State.'   See also *Jackson* v. *Chew,* 12 Wheat., 153.

"Up to the present time these principles have not been modified or disregarded by this court.   On the contrary they have

been reaffirmed without substantial qualification in many subsequent cases, some of which are here cited. *East Alabama Ry. Co.* v. *Doe,* 114 *U. S.,* 340; *Bucher* v. *Cheshire R. R. Co.,* 125 U. S., 555; *Gormley* v. *Clark,* 134 U. S., 338; *B. & O. R. R. Co.* v. *Baugh,* 149 *U. S.,* 368; *Folsom* v. *Ninety-six,* 159 U. S., 611; *Barber* v. *Pittsburg &c. Ry.,* 166 U. S., 83; *Stanley County* v. *Coler,* 190 U. S., 437; *Julian* v. *Central Trust Co.,* 193 U. S., 93; *Comm'rs &c.* v. *Bancroft,* 203 U. S., 112; *Presidio County* v. *Noel Young Bond Co.,* 212 U. S , 58.

"We take it, then, that it is no longer to be questioned that the Federal courts in determining cases before them are to be guided by the following rules: 1.    When administering state laws and determining the rights accruing under those laws the jurisdiction of the Federal court is an independent one not subordinate to but co-ordinate and concurrent with the jurisdiction of the state courts.    2.    Where, *before the rights of the parties accrued,* certain rules relating to real estate have been so established by state decisions as to become rules of property and action in the State, those rules are accepted by the Federal court as authoritative declarations of the law of the State.    3.    *But where the law of the State has not been thus settled,* it is not only the right but the duty of the Federal court to exercise its own judgment, as it also always does when the case before it depends upon the doctrines of commercial law and general jurisprudence.    4.    So, when contracts and transactions are entered into and rights have accrued under a particular state of the local decisions, *or where there has been no decision by the state court on the particular question involved,* then the Federal courts properly claim the right to give effect to their own judgment as to what is the law of the state applicable to the case, even where a different view has been expressed by the state court after the rights of parties accrued.    But even in such cases, for the sake of comity and to avoid confusion, the Federal court should always lean to an argument with the state court if the question is balanced with doubt.

"The court took care, in *Burgess* v. *Seligman,* to say that the Federal court would not only fail in its duty, but would defeat the object for which the national courts were given jurisdiction of controversies between citizens of different states,

if, while leaning to an agreement with the state court, it did not exercise an independent judgment in cases involving principles not settled by previous adjudications.

"It would seem that according to these principles, now firmly established, the duty was upon the Federal court, in the present case, to exercise its independent judgment as to what were the relative rights and obligations of the parties under their written contract. The question before it was as to the liability of the Coal Company for an injury arising from the failure of that corporation, while mining and taking out the coal, to furnish sufficient support to the overlying or surface land. Whether such a case involves a rule of property in any proper sense of those terms, or only a question of general law within the province of the Federal court to determine for itself, the fact exists that there had been no determination of the question by the State court before the rights of the parties accrued and became fixed under their contract, or before the injury complained of. In either case, the Federal court was bound under established doctrines to exercise its own independent judgment, with a leaning, however, as just suggested, for the sake of harmony, to an agreement with the state court, if the question of law involved was deemed to be doubtful. If, before the rights of the parties in this case were fixed by written contract, it had become a settled rule of law in West Virginia, as manifested by decisions of its highest court, that the grantee or his successors in such a deed as is here involved, was under no legal obligation to guard the surface land of the grantor against injury resulting from the mining and removal of the coal purchased, a wholly different question would have been presented.

"There are adjudged cases involving the meaning of written contracts having more or less connection with land that were not regarded as involving a rule in the law of real estate, but as only presenting questions of general law touching which the Federal courts have always exercised their own judgment, and in respect to which they are not bound to accept the views of the state courts. Let us look at some of those cases. They may throw light upon the present discussion.

"In *Chicago City* v. *Robbins,* 2 Black, 418, 428, which was an action on the case for damages, the question was as to the

right of the city of Chicago—which was under a duty to see that its streets were kept in safe condition for persons and property—to hold one Robbins liable in damages for so using his lot on a public street as to cause injury to a passer-by. The city was held liable to the latter and sued Robbins on that account. The state court, in a similar case, decided for the defendant, and it was contended that the Federal court should accept the views of the local court as to the legal rights of the parties. But this court, speaking by Mr. Justice Davis, said: 'Where the rules of property in a state are fully settled by a series of adjudications, this court adopts the decisions of the state courts. But where private rights are to be determined by the application of common-law rules alone, this court, although entertaining for state tribunals the highest respect, does not feel bound by their decisions.'

"In *Lane* v. *Vick*, 30 How., 464, 472, 476, the nature of the controversy was such as to require a construction of a will, which, among other property, devised certain real estate which, at the time of suit, was within the limits of Vicksburg, Mississippi. There had been a construction of the will by the Supreme Court of the State, 1 How. (Miss.), 379, and that construction, it was insisted, was binding on the Federal court. But this court said: 'Every instrument of writing should be so construed so as to effectuate, if practicable, the intention of the parties to it. This principle applies with peculiar force to a will.... The parties in that case were not the same as those now before this court; and that decision does not affect the interests of the complainants here. The question before the Mississippi court was, whether certain grounds, within the town plat, had been dedicated to public use. The construction of the will was incidental to the main object of the suit, and of course was not binding on any one claiming under the will. With the greatest respect, it may be proper to say, that this court does not follow the state courts in their construction of a will or any other instrument, as they do in the construction of statutes. Where, as in the case of *Jackson* v. *Chew*, 12 Wheat., 167, the construction of a will had been settled by the highest courts of the State, and *had long been acquiesced in as a rule of property, this court would follow it, because it had become a rule of property.* The

construction of a statute by the Supreme Court of a State is followed, without reference to the interests it may affect, or the parties to the suit in which its construction was involved. But the mere construction of a will by a state court does not, as the construction of the statute of the state, constitute a rule of decision for the courts of the United States. In the case of *Swift* v. *Tyson,* 16 Pet., 1, the effect of section 34 of the Judiciary Act of 1789, and the construction of instruments by the state courts, are considered with greater precision than is found in some of the preceding cases on the same subject.'

"In *Foxcroft* v. *Mallett,* 14 How.,353, 379, the object of the action was to recover certain land in Maine. The case turned in part on the construction to be given to a mortgage of certain land to William College, and to local adjudications relating to those lands, which, it was contended, were conclusive on the parties. 'But,' this court said, 'on examining the particulars of the cases cited to govern this (3 Fairfield, 398; 4 Shepley, 84, 88; 14 Maine, R., 51), it will be seen that the construction of the mortgage to the college, in respect to this reservation or condition, never appears to have been agitated. If *it had been,* the decision would be entitled to high respect, though it should not be regarded as conclusive on the mere construction of a deed as to matters and language belonging to the common law, and not to any local statute. 3 Sumner, 136, 277.'

"In *Russell* v. *Southard,* 12 Howard, 139, 147, the controlling question was whether in any case it was admissible to show by extraneous evidence that a deed on its face of certain real estate in Kentucky was really intended by the parties as a security for a loan and as a mortgage. The court, speaking by Mr. Justice Curtis, after citing adjudged cases sustaining the proposition that evidence of that kind was admissible in certain States, said: 'It is suggested that a different rule is held by the highest court of equity in Kentucky. If it were, with great respect for that learned court, this court would not feel bound thereby. This being a suit in equity, and oral evidence being admitted, or rejected, not by the mere force of any state statute, but upon the principles of general equity jurisprudence, this court must be governed by its own views of those principles'—citing *Robinson* v. *Campbell,* 3 Wheat., 212; *United States* v. *Howland,* 4

·Wheat., 108; *Boyle* v. *Zacharie*, 6 Pet., 635, 658; *Swift* v. *Tyson,* 16 Pet., 1; *Foxcroft* v. *Mallett,* 4 How., 353, 379.

. "In *Yates* v. *Milwaukee,* 10 Wall., 497, 506, the question was as to the nature and extent of the right of an owner of land in Wisconsin, bordering on a public navigable water, to make a landing, wharf or pier for his own use or for the use of the public. There was a question in the case of dedication to public use, and the City of Milwaukee sought to change or remove the wharf erected by the riparian owner in front of his lot. The court, speaking by Mr. Justice Miller, said: 'The question of dedication, on which the whole of that case turned, was one of fact, to be determined by ascertaining the intention of those who laid out the lots, from what they did, and from the application of general common law principles to their acts. This does not depend upon state statute or local state law. The law which governs the case is the common law, on which this court has nev-er acknowledged the right of the state courts to control our decisions, except, perhaps, in a class of cases where the state courts have established, by *repeated decisions,* a *rule of property* in regard to land titles peculiar to the State.'

"In *Louisville Trust Co.* v. *City of Cincinnati,* 76 Fed., 296, 300, 304, which was a suit by a Kentucky corporation, it became necessary to determine the force and effect of a mortgage originating in a state statute .of Ohio and certain municipal ordinances covering street easements in Cincinnati. The state court, in a suit to which the .trustee in the mortgage was not a party, passed a decree declaring the scope, effect and duration of contracts or ordinances under which the mortgage, easements and franchises originated. It was insisted that the Federal court was bound to accept the views of the State court. But the Circuit Court of Appeals, held by Judges Taft, Lurton and Hammond, ruled otherwise. Judge Lurton, speaking for all the members of that court, made an extended review of the authorities, and observed that if the state decision was regarded as conclusive upon the parties, 'the constitutional right of the complainant, as a citizen of a State other than Ohio, to have its rights as a mortgage defined and adjudged by a court of the United States is of no real value. If this court cannot for itself examine these street contracts and determine their validity,

effect and duration, and must follow the interpretation and construction placed on them by another court in a suit begun *after its rights as mortgagee had accrued, and to which it was not a party,* then the right of such a mortgagee to have a hearing before judgment and a trial before execution is a matter of form without substance. The better forum for a suitor so situated would be a court of the State.... The validity, effect, and duration of the street easements granted or claimed under these laws and ordinances is a question which this complainant is entitled to have decided by the courts of the United States, and the opinion of the Supreme Court of Ohio, while entitled to the highest respect as a tribunal of exalted ability, can be given no greater weight or respect than its reasoning shall demand, where the contract rights of a citizen of another state are involved, who was neither a party nor privy to the suit in which that opinion was delivered. The special fact, therefore, which justifies us in determining for ourselves the true meaning and validity of the Ohio statute and city ordinances, out of which the rights of this complainant spring, is the fact that it is a citizen of another State, and that the contract under which it has acquired an interest originated prior to the judicial opinion relied upon as foreclosing our judgment.'

"Upon the general question as to the duty of the Federal court to exercise its independent judgment where there had not been a decision of the state court, on the question involved before the rights of the parties accrued, *Carrol County* v. *Smith,* 111 U. S., 556, and *Great Southern Hotel Co.* v. *Jones,* 193 U. S., 532, 548, are pertinent. In the first-named case the court was confronted with a question as to the validity under the state constitution of a certain statute of the state. Mr. Justice Mathews, delivering the unanimous judgment of the court, said (p. 563): 'It was not a rule previously established, so as to have become recognized as settled law, and which, of course, all parties to transactions afterwards entered into would be presumed to know and to conform to. When, therefore, it is presented for application by the courts of the United States, in a litigation growing out of the same facts, of which they have jurisdiction by reason of the citizenship of the parties, the plaintiff has a right, under the Constitution of the United States, to the independent

judgment of those courts, to determine for themselves what is the law of the state, by which its rights are fixed and governed.   It was to that very end that the Constitution granted to citizens of one state, suing in another, the choice of resorting to a Federal tribunal.  *Burgess* v. *Seligmen,* 107 U. S., 20, 33.'   The other case—*Great Southern Hotel Co.* v. *Jones* presented a controversy between citizens of different states.   It was sought by the plaintiffs, citizens of Pennsylvania, to enforce a *mechanic's lien upon certain real property* in Ohio.   The main question was as to the validity of a statute of Ohio under which the alleged lien arose.   It was contended that a particular decision of the state court holding the statute to be a violation of the state constitution was conclusive upon the Federal court.   But this court following the rules announced in *Burgess* v. *Seligman,* rejected that view by a unanimous vote.   It said (p. 548) : 'If, *prior to the making of the contracts between the plaintiffs and McClain,* the state court had adjudged that the statute in question was in violation of the state constitution, it would have been the duty of the Circuit Court, and equally the duty of this court, whatever the opinion of either court as to the proper construction of that instrument, to accept such prior decision as determining the rights of the parties accruing thereafer.   But the decision of the state court, as to the constitutionality of the statute in question, having been entered *after the rights of the parties to this suit had been fixed by their contracts,* the Circuit Court would have been derelict in duty if it had not exercised its independent judgment touching the validity of the statute here in question. . In making this declaration we must not be understood as at all qualifying the principle that, in all cases, it is the duty of the Federal court to lean to an agreement with the state court, where the issue relates to matters depending upon the construction of the constitution or laws of the State."

This case was re-argued at the February (1910) Term of this court, the Supreme Court having decided that the decision of the Supreme Court of Appeals of West Virginia is not a rule of property, and, therefore, not binding upon this court.

It now becomes our duty to determine as to whether, in passing upon the question presented, this court should in the exer-

cise of its independent judgment, under the circumstances surrounding this proceeding, adopt the ruling announced by the Supreme Court of Appeals of West Virginia, as the law in this case.

The Supreme Court of Appeals of West Virginia, in the case of *Griffin* v. *Fairmont Coal Co., supra,* considered this question at great length. Judge McWhorter, who delivered the opinion of the court, in referring to the concurring opinion of Judge Cox, said:

"The reasons for our decision in this case are more elaborately set out in an opinion filed by Judge Cox, which appears below, and in which all the members of the court concur, except Judge Poffenbarger, who dissents from the decision."

In view of this statement, we call attention to a portion of the opinion of Judge Cox, which clearly and concisely states the question at issue, and the reasons upon which the opinion of that court is based:

"I concur in the conclusion reached by this court in this case; I have no quarrel with the doctrine or right of subjacent support, when it has not been parted with, applicable where the surface and subjacent estate in the same land are owned by different persons. I do not condemn or question what I deem the best considered cases and text books expounding this doctrine. Owing to these facts, and to the very great importance of this case, I have concluded to prepare this opinion.

"This case is on a writ of error to the judgment of the circuit court, sustaining a demurrer to the declaration and dismissing the action. It appears from the averments of the declaration, which for the purposes of demurrer must be taken as true, that plaintiff, Griffin, being the owner in fee of 68.89 acres of land in Harrison County underlaid with coal, sold and conveyed the coal (except 3 acres thereof) to Camden, with the following mining rights and privileges: 'The party of the second part and his assigns is to have the right of way through said reservation for a road, air-course and drain way necessary or convenient for the mining and removal of said coal and the coal under coterminous and neighboring lands, together with the right to enter upon and under said land and to mine, excavate and remove, all of said coal and remove upon and under said

land the coal from under adjacent, coterminous and neighboring lands, and also the right to enter upon and under the tract of land hereinbefore described, and make all necessary structures, roads, ways, excavations, air-shafts, drains, drain-ways, and openings necessary or convenient for the mining and removal of said coal, and the coal from coterminnus and neighboring lands, to market.'

"The defendant company became the owner of said coal and mining rights and privileges conveyed to Camden. The defendant, having removed a part of said coal, leaving blocks or pillars thereof, afterwards removed the blocks or pillars, completing the removal of all the coal without leaving support for the surface, thus causing subsidence of the surface, as plaintiff avers, to his injury and damage.

"Plaintiff brings this action of trespass on the case for damages, not relying upon any express covenant or provision of the deed of conveyance, which constitutes the contract between the parties, but relying upon what is termed the doctrine or right of subjacent support. The only act complained of is the act of removing all the coal conveyed without leaving support. The manner of the removal is not complained of; and no negligence in the manner of removal is averred. The act of removal itself, and not the manner of doing the act, is averred to be negligent. This being the case, there is for determination the single question: Was the removal of all the coal conveyed without leaving support in violation of plaintiff's right?

"This leads us to a consideration of the doctrine or right of subjacent support. We are cited to no previous decisions in point in this State, or in the State of Virginia before the formation of this State. We are cited to many decisions and text-books, both English and American, which are not said to be binding authority upon this court, but which may be termed persuasive reasoning. They appeal to us, and should govern us so far, and only so far, as they appear to us to be founded upon correct principles. We are seeking the right—the truth—and should accept it wherever found.

"In this investigation, we turn naturally to England, which I think may be termed the parent of the doctrine of subjacent support. The first cases were decided there.

"No case or text-book either English or American, will be found which rests this doctrine or right of subjacent support upon more than two grounds, or, rather, which holds that the doctrine or right is composed of more than two ingredient propositions. They are: First, a presumptive or implied reservation to the surface owner of sufficient of the subjacent strata or estate to support the surface *modo et forma.* Second, the principle of law expressed in the Latin maxim: *Sic utere tuo ut alienum non laedas*—literally construed, 'So use your own property as not to injure the property of another.' Many authorities rest the whole doctrine upon the last proposition only. The principle contained in the first proposition, when applied to a case where the fee owner has granted the surface and reserved the underlying strata or estate, would necessitate an implied additional grant of so much of the subjacent strata or estate as was necessary to support the surface, but we are not dealing with that case here.

"The first proposition was announced by Lord Campbell in *Humphreys* v. *Brogdon,* 12 Q. B., 739, decided in 1850, in which he used this language: 'If the surface and the minerals are vested in different owners without any deeds to regulate their respective rights, we see no difficulty in presuming that the severance took place in a manner which would confer upon the owner of the surface a right to the support of the minerals. If the owner of the entirety is supposed to have alienated the surface, reserving the minerals, he cannot be presumed to have reserved to himself, in derogation of his grant, the power of removing all of the minerals without leaving a support for the surface; and if he is supposed to have alienated the minerals, reserving the surface, he cannot be presumed to have parted with the right to that support for the surface by the minerals which it had ever before enjoyed.'

"This was not the first case in England upon the subject of subjacent support, as thought by some. Lord Campbell in that case also recognized the second proposition above mentioned, but reached his conclusion by analogy to the severance of the ownership of the different stories of a house, quoting Irskine's Inst. as follows: 'Where a house is divided into different floors or stories, each floor belonging to a different owner, which fre-

quently happens in the city of Edinburgh, the proprietor of the ground floor is bound, by the nature and condition of his property, without any servitude, not only to bear the weight of the upper story, but to repair his own property, that it may be capable of bearing the weight. The proprietor of the ground story is obliged to uphold it for the support of the upper, and the owner of the upper must hold that as a roof or cover to the lower.'

"Lord Campbell in that case was very guarded in holding that the law there laid down only applied where the surface belonged to one man and the minerals to another, and no evidence of title appeared to regulate or qualify their rights of enjoyment. The last clause of the opinion contains the following language: 'I need hardly say that we do not mean to law down any rule applicable to a case where the *prima facie* rights and liabilities of the owners of the surface of the land and of the subjacent strata are varied by the production of title deeds, or by other evidence.'

"The earlier English case of *Harris* v. *Ryding*, 5 M. & W. Rep., 59, decided in 1839, held that the mining rights in the deed in question applied to acts to be done upon the surface of the land, and did not enlarge the rights of the owner of the minerals, under the ground, beyond what they were without the mining rights. Baron Park there reached his conclusion in this language: 'I do not mean to say that all the coal does not belong to the defendant, but that they cannot get it without leaving sufficient support.'

"Some English and American cases have followed the two English cases cited, resting their decisions, at least in part, upon the theory of a presumptive or implied reservation of so much of the subjacent strata or estate as is necessary to support the surface. The case of *Noonan* v. *Pardee*, 200 Pa., 474, carried that theory to its logical conclusion by holding: 'What the surface owner has a right to demand is sufficient support, even if to that end it be necessary to leave every pound of coal untouched under his land.'

"In Blanchard & Weeks' Note to the case of *Jones* v. *Wagner*, in Leading Cases on Mines, etc., p. 617, it is said: 'There is a *prima facie* inference at common law, upon every demise of minerals and other subjacent strata where the surface is retained

by the lessor, that the lessor, is demising them in such a manner as is consistent with the retention by himself of his own right to support. The absence of express words showing clearly that he has waived or qualified his right, the presumption is that what he retains is to be enjoyed by him *modo et forma,* and with the natural support which it possessed before the demise.'

"The theory of implied reservation or implied grants has been couched in different language in different cases. Some cases have said that the subjacent estate owes a servitude to the superincumbent surface. Others have said that the surface owner is entitled to an easement. Others have called the right of subjacent support *ex jure naturae;* and still others have said that the right is a part of the surface, and as such may not pass except by express words. In whatever language the decisions referred to may be couched, in the last analysis they rest upon the authority of *Humphreys* v. *Brogden,* holding that there is a presumptive or implied reservation or an implied grant.

"The theory of an implied reservation is earnestly relied on by the learned attorneys for the plaintiff in their original brief. I quote therefrom as follows: 'In a grant like the one at bar, a reserve of the right of surface support is implied.' This proposition of the early English cases, of an implied reservation in the face of an express grant, has been much questioned and criticised in England, and, it seems to me, with great reason. I do not think that, in a case where the owner of the fee granted or conveyed the underlying strata or estate, the theory of implied reservation, amounting if necessary to the whole of the thing granted, could ever have been maintained upon sound reason. It seems to me that the first part of the statement above quoted from Lord Campbell in *Humphreys* v. *Brogdon,* viz., that the grantor in case of the reservation of the minerals cannot be presumed to have reserved to himself in derogation of his grant, the power of removing all the minerals without leaving a support for the surface, furnishes a conclusive reason for overthrowing the second part of his statement quoted, viz., that in case the owner of the entirety is supposed to have alienated the minerals, reserving the surface, he cannot be presumed to have parted with the right to that support for the surface by the mineral which it had ever before enjoyed. The latter part of the statement necessarily implies a reservation

in derogation of the grant—the very thing condemned in the first part of the statement.

"I cannot see how, against every rule of construction, where a deed has been made by the owner of the fee, granting in express terms all the subjacent strata or estate, that the right of subjacent support may be based upon the ground that there is a presumptive or implied reservation by such a deed, in which there is no express limitation, reservation or exception, and in derogation of the express terms of the grant, of so much of the subjacent strata or estate, to the extent of all if necessary, to support the overlying surface. Such a proposition seems to me to be contrary to all principles of law. I am not, however, saying that the doctrine or right of subjacent support does not exist where it has not been parted with; but I do say that I cannot assent to the proposition that it emanates from a presumptive or implied reservation of so much of the estate granted as is necessary to support the surface.

"An inconsistency running through most of the cases holding to the theory of an implied reservation is they concede that after the grant the grantee is the owner of the thing granted.

"In the later case of *Eadon* v. *Jeffcock*, L. R., 7 Ex., 379, decided in 1872, the provisions of a lease of a bed of coal were involved; and the court held that the intention of the parties was that all the coal should be removed, other than certain pillars specified by the terms of the lease, and that the lessees were not otherwise liable for failure to leave support for the surface. There is no difference in principle between a lease and a deed of conveyance. *Davis* v. *Treharne*, 6 App. Cas., 460. I do not find that this case of *Eadon* v. *Jeffcock* has been overruled. On the contrary, it is cited as late as 1902, as one of the leading English cases. It is true that in the case of *Davis* v. *Treharne*, *supra*, Lord Blackburn alone, of the three Lords, delivering opinions, including the Lord Chancellor, said: 'I cannot agree with what seems to have been said by Baron Cleasby in the case of *Eadon* v. *Jeffcock*.' The other Lords delivering opinions did not question that case; and it was not there overruled. In the case of *Eadon* v. *Jeffcock*, Baron Cleasby said in part: 'It appears to us that, outside of this contract, there is no reservation of any right to support, whatever the exact nature of that

right may be, but that we must look at the contract itself, and by a proper construction of it, having regard, of course, as in all cases, to the subject matter, arrive at the extent to which the owner authorizes the minerals to be removed.' He also quotes from Lord Wensleydale in *Rowbotham* v. *Wilson,* 8 H. L. C., 359, as follows: 'Whether the right to support given by the land below to the land of the owner of the surface, when the strata belong to different persons, properly is to be called an easement, as it is by Mr. Gale in his excellent treaties on easements, " 'a natural easement' " or, whether the owner of the surface has merely a right to enjoy his own land in its natural state and condition with a right of action against the owner of the land adjoining or subjacent when the act of his neighbor does him an injury, are questions immaterial to the decision of this case, though the last proposition appears to be fully established by the judgment of the Court of Exchequer Chamber in *Bonomi* v. *Backhouse,'* 9 H. L. C., 503.

"Baron Bramwell, delivering an opinion in the case of *Eadon* v. *Jeffcock,* said, in part: 'In this case the defendants have a lease of a seam of coal. It may not appear of much consequence by what name their interest is called, but the word lease may in such cases have helped to a particular conclusion. For by that word we commonly understand a temporary estate granted in something which, at the end of the term, is to be restored to the lessor in the condition in which it was delivered to the lessee, fair wear and tear excepted, as in a lease of land, house or a moveable chattel. But that is not the intention of a lease of a seam of coal. That is more a sale of the coal, or a grant of a right to take and remove it within a certain time, and it is not to be restored at the end of that time to the grantor. Treat it as a sale of the coal, provided the vendee get it all within a certain time; and why should the grantor be at liberty to say: "Though in terms I sold the whole of it, yet by implication I reserved as much as was necessary to support the surface in its natural condition." Why should not the argument be good, " 'If you meant that exception you should have said so in words.' " Suppose a sale of brick, earth or gravel by metes and bounds, and suppose the vendee took it all, and suppose then the soil of the vendor outside of the boundary crumble in for want of lateral support would the vendee be liable to a

claim in respect thereof by his vendor, and, if he would, why? With great respect, such a dealing with a seam of coal is more like selling the materials of an intermediate floor than letting or selling the floor. Suppose a man with a three story house sold the materials of the second floor, would he have a right to say, "But you must leave enough to support my third story or you must prop it up?" It is true a lessee of a mine may take all the coal and artificially prop the surface; but, practically, this is impossible, owing to the expense; and the same argument applies, viz., why did not the grantor stipulate for it? It may be said that if this argument is true of a lease or grant of coal, to be taken in a certain time, it would be equally so of a grant to be taken whenever the grantee thought fit; if so, of all cases where the ownership of mines and surface was severed; and that the authorities are overwhelmingly the other way. But, in the first place, the argument is not so strongly applicable where the grant allows the grantee to take at any time, because the grantor may well allow his land to be let down provided it is to be down within a certain time; where he would object if he could not tell for all futurity when it might happen. In the next place, where the terms of the severance are not known, but only that there is a severance, then it may as well be presumed one way as the other. That is a case of ownership, not contract, as this is. Here the terms of the contract that gives the right to take the coal are known, and the question is, why does not the general principle apply, viz., look at what is said in the deed, and add nothing except from a necessity for doing so." Yet Baron Bramwell felt bound by the previous decisions of his own country, and doubted as to his decision.

"It is obvious that the English courts are no longer in sympathy with the theory of presumptive or implied reservation of so much of the thing granted as is necessary for support, as a basis for the right of support. *Rowbotham* v. *Wilson, supra; Bonomi* v. *Backhouse, supra.* Our statute, section 2, chapter 72, Code, provides: 'Every such deed, conveying lands, shall, unless an exception be made therein, be construed to include all the estate, right, title and interest whatever, both at law and in equity, of the grantor, in or to such lands.'

"Shall we still say that there is an implied reservation, in derogation of the express grant? The answer is apparent.

"What we have said does not dispose of the whole doctrine of subjacent support. What is the doctrine or right in this state, and upon what does it rest? It rests upon, and consists solely of, the second proposition above stated—the principle of law, *Sic utere tuo ut alieum non laedas.* This rule of law expresses all that there is of the doctrine. This position seems to be fully recognized by plaintiff's petition for a rehearing.

"It may be asked, what is the difference upon what ground the doctrine or right of subjacent support rests, so that it exists. The reply is that the difference is not so much in the existence as in the manner in which it may be parted with by the surface owner. If the right of support is a reservation of the subjacent estate, or a servitude upon it, or an easement in favor of the surface owner, or a part of the surface estate, there is more show of reason in saying that the right of support may not be parted with by implication or without express words, than there is when the right is considered to consist only of a rule of law commanding that you shall not use your own so as to injure that of another.

"This rule of law relates to the use and enjoyment of property, and not to the ownership of property. As a rule of law it is negative in its application, forbidding the use so as to injure that of another. It is not a servitude when applied between the owner of the surface and the owner of the subjacent strata of land, in the strict sense of that term, any more than it is a servitude upon all property. Likewise, it is not, strictly speaking, an easement in favor of one owner of property against another. It is no more a part of the surface than of the subjacent estate in land, although applicable to both. It has no more force when applied between the different owners of the surface and subjacent estates in land, than when applied between the different owners of property everywhere and of all kinds. As a rule of law, it must be always the same—constant, invariable, and immutable.

"By the side of this principle of law, and to be applied in harmony with it, there is another which must be considered. It is the proprietary right of the owner of property—the principle of absolute dominion where there is absolute ownership.

"Under the principle of law, *Sic utere, &c.,* I think it is inconvertible that where the surface and subjacent strata or estate

in the same land are owned by different persons, and the right of support has not been parted with by the surface owner, the surface owner is entitled to subjacent support; or, as many of the authorities put it, the surface owner is entitled *prima facie* to support. All the authorities agree upon that proposition. Also, all of the authorities recognize the principle, *Sic utere, &c.*, as one ground of the doctrine of support. Why? Because when the ownership is served, two separate estates are formed, and neither may be used by the owner to the injury of the other. The owner of the subjacent estate may not so use his own by removing all of it, as to injure the surface estate; but so long as the removal does not injure the surface estate, he may remove.

"Considering this rule of law as the doctrine of subjacent support in this State, how may the surface owner waive or exclude the right of support? which is simply another form of asking how he may waive or exclude the benefit of the law mentioned. I would answer that he may waive or exclude the benefit of this rule of law in precisely the same way that he may waive or exclude it in relation to any other property owned by him, or any other rule of law the violation of which has caused or will cause him injury. It is now fully settled by the authorities, no matter upon what ground they base the right of support, that the surface owner may waive or exclude it by contract. 'The right to remove all the minerals in a certain strata, though the support of the superincumbent strata is destroyed thereby, may be created by apt words.' 6 Am. & Eng. Dec. Eq., 643, and English and American cases there cited.

"Great difficulty has been experienced by the courts, upon consideration of the several instruments before them, as to what words, or whether the particular words involved, evinced an intent to part with the right of support.

It seems now to be fully settled that the right of subjacent support may be waived or excluded by plain implication.

"The principal controversy in this case resolves itself to this: Has the plaintiff waived or excluded the right of support, by the deed of conveyance mentioned in the declaration? Let us look at the cases claimed to construe instruments similar in language to that used in this contract. Let me say that none of them interpret language exactly like the contract here presented.

"The case chiefly relied upon by plaintiff is the English

case of *Harris* v. *Ryding, supra.* As e have said, in that case it was expressly held that the mining rights related to acts to be exercised upon the surface of the land, and that they did not give additional rights to the owner of the minerals reserved, under the ground. Certain American cases are cited, such as *Carlin & Co.* v. *Chappel,* 101 Pa. St., 348; *Burgner* v. *Humphreys,* 41 Ohio St., 340; *Livingstone* v. *Coal Co.,* 49 Ia., 369; *Williamson* v. *Hay,* 120 Pa. St., 485, and others. An examination of these cases will show that they adhere, in some form of expression, to the theory of implied reservation or implied grant as a ground of support, following in the footsteps of *Humphreys* v. *Brogdon.* So following, they in effect refuse to admit that the owner may waive the right of subjacent support by implication. I cannot pass this subject, however, without saying that I can in no sense agree with the two cases cited of *Livingstone* v. *Coal Co.* and *Wiliamson* v. *Hay,* upon the question of construction. The language of the instruments construed in those cases will be found in the reports thereof. It seems to me that the language used in those instruments was sufficient to waive and exclude the right of support, without considering whether that right rests upon one or both of the propositions first above mentioned. It was Judge Story who said: 'Where the language of an instrument is neither uncertain nor ambiguous, it is to be expounded according to its apparent import, and is not to be warped from the ordinary meaning of its terms in order to harmonize it with uncertain suppositions, in regard either to the probable intention of the parties contracting or to the probable changes which they would have made in their contract had they foreseen certain contingencies.' Those cases seem to me to do violence to the principles of law stated.

"In the Ohio case referred to, the agreement or lease was of the coal, with the right to remove the same. We are not construing that language here. It will be observed that the extent to which the coal might be removed, or the manner of its removal, are not expressed in that instrument. The mining right may not have amounted to more than the grantee or lessee would otherwise have been entitled to as a right of way of necessity, without words. As to that, I do not decide.

"In the work on Mines by Robert Foster McSwinney, of London, issued in 1884, all previous English cases are reviewed,

and the rules governing the interpretation of instruments and contracts in relation to support obtaining in England are laid down. I quote from that work, page 304, as follows: 'If apt words are used, whether in the instrument of severance itself; or in a contemporaneous, or a subsequent instrument; and whether in affirmative or negative terms and whether in express terms, or by plain implication; and whether the underlying mines are granted or excepted; and whether the instrument is voluntary or statutory; the right of support for land in its natural state may be effectually excluded,'—citing *Rowbotham* v. *Wilson*, 6 E. & B., 593; *Shafto* v. *Johnson*, 8 B. & S., 252; *Taylor* v. *Shafto, Id.*, 228; *Murchie* 7. Black, 19 C. B. N. S., 207; *Williams* v. *Bagnall*, 15 W. R., 272; *Buccleuch* v. *Wakefield*, L. R., 4 H. L., 377; *Smith* v. *Darby*, L. R., 7 Q. B., 716; *Eadon* v. *Jeffcock*, L. R., 7 Exch., 379; *Buchanan* v. *Andrew*, L. R., 2 Sc. & D., 288; *Aspden* v. *Sedden*, 10 Ch., 396; *Gill* v. *Dickinson*, 5 Q. B. D., 159; *Davis* v. *Treharne*, 6 App. Cas., 466; *Dalton* v. *Angus, Id.*, 809; *Chapman* v. *Day*, 47 L. T., 709; *Munday* v. *Rutland*, 23 Ch. D., 81; *Belt* v. *Love*, 10 Q. B. D., 558. A number of cases are there cited in which the right of support was held to have been waived or excluded, either by the express terms of the contract or by plain implication.

"In *Smith* v. *Darby, supra,* decided in 1872, Lord Blackburn said: 'But does not this deed say, "You may take them' absolutely, only making compensation afterwards"? I cannot agree that there is any argument to be derived from the use of affirmative words only, without any negative word. The question is: What was the intention of the parties to the deed, when there is an affirmative promise to pay money to the tenants, and what was the bargain as to the sale of the property? If the owner of a horse said: "You may take the horse," and the person to whom this was said had promised to give £20 for it, there is no question that he could not be sued in an action of trespass for taking the horse, because the intention of the parties was that the one was to buy and other sell the horse. So here the question is whether it appears upon the clauses in the deed that the intention of the parties was that the minerals should go absolutely, without any restriction as to the right of support.'

"In *Aspden* v. *Sedden, supra,* decided in 1875, Sir G. Mel-

lish, L. J., in the opinion said: 'If it appears from any express words in the deed, or by necessary intendment from anything contained in the deed, that it was not the intention of the parties that there should be any right to support, the court is bound to hold that the plaintiffs have failed to make out their case.' Also, 'If liberty is reserved to do the act complained of, that reservation, as between the parties and those claiming under them, makes the act rightful?

"In *Buchanan* v. *Andrew, supra,* decided in 1873, the Lord Chancellor said: 'My Lords, generally speaking, when a man grants the surface of land, retaining the minerals, he is guilty of a wrongful act if he so uses his own right to obtain the minerals as to injure the surface, or the things upon it; and, as prevention is better than cure, the court would be justified in granting an interdict to prevent him from doing so. But on the other hand, I apprehend it is the clear law of England, and also of Scotland, that when two persons meet and deliberately settle a contract they are at liberty to enter into such terms (not being contrary to the public law) as they may think fit; and if a *feuar* of surface lands is willing to take the risk of any injury which may be done by the working of subjacent minerals, it is perfectly lawful for him to do so; the person who was previously the owner of the entirety being under no antecedent obligation to part withm any portion previously his own, except upon such terms as are mutually agreed upon. In such a case, therefore, the whole matter resolves itself into a mere question of construction. No views of a conjectual kind as to what is or what is not reasonable can be admitted, if the contract itself is plain and free from ambiguity.'

"In *Davis* v. *Treharne, supra,* Lord Blackburn said, in relation to the exclusion of the right of support: 'If Mr. Treharne, when he left the land, had by express words or by necessary implication, said, "*'You may take away all the* minerals,*"* or, "You must take away all the minerals, letting down the surface," he had a perfect right, at least before he had made the two building leases, to do so.'

"Other English cases might be cited on the question of the interpretation of instruments as to waiver or exclusion of the right of support. From them it is simply a question of intention, in the usual way, from the words used in the instrument.

"In McSwinney on Mines, this subject is treated under certain divisions. Under the division '(d)', the first case reviewed is *Harris* v. *Ryding, supra,* I quote from that work, on page 339, as follows: 'With respect generally to the various cases referred to in divisions (b), (g), (d) and (e) of the present subject, the following observations may be made. In the earlier cases the courts, in construing the instruments before them, apparently adopted the curious mode, both in the case of land in its natural state, and of land in its non-natural state, of assuming, in the first instance, the existence of an intention, that the right of support should not be disturbed; and of then proceeding to consider, whether the provisions used could not be reconciled with that intention. In the later cases, on the other hand, the courts seem to have assumed nothing; but to have proceeded at once to construe the instruments before them according to their literal and natural meaning. It is, in many respects, difficult to reconcile the earlier with the later cases; and, on these grounds, the difficulty seems capable of explanation. It need hardly be added that the later cases must, at the present day be considered authoritative.

" 'Having regard to these circumstances, the following propositions may, as the result of the cases, in which the instrument of severance is producible, and in which some contract has been made, or is said to have been made, with respect to support, be considered as established:

" '1. Instruments of severance are, at the present day, construed according to their literal and natural meaning, rather than according to preconceived assumptions of the existence of an intention in the parties, or in the legislature, that the right of support should not be disturbed.

" '2. Where it appears from the express words of such instruments, or by clear intendment therefrom, that it was the intention to exclude the right, effect will be given to such intention.

" '3. Where the mine owner is relieved from liability for damage, the surface owner may often be presumed to have been compensated by anticipation. But in other cases, the presence of a clause for compensating the surface owner; at all events if it refers to underground working; are material elements in ascertaining an intention to exclude the right.'

\*     \*     \*     \*     \*     \*     \*     \*     \*

" "7.  The common covenants to work in the usual and most approved mode, or the common clause in an Inclosure Act under which mines are reserved to the lord, of holding and enjoying them in as full, ample and beneficial a manner as if the act had not been made; or the common clauses giving full liberty of working and winning; are not, of themselves, sufficient to exclude the right.'

"Other propositions are deducted by the author, which I deem it unnecessary to repeat.

"From this it appears that the early English cases, such as *Harris* v. *Ryding,* are discredited in their own land upon the question of the construction of instruments relating to the waiver or exclusion of support, and are no longer considered as authority at home on that question.  They are, however, relied on here as conclusive on that question.  It seems to me that these early English cases would come with more force, as persuasive argument, if they had not been discredited in the land from which they come.

"It is hardly necessary to say that American cases which adhere to, and follow implicitly in the footsteps of, those early English cases, on the question of construction of instruments of severance, adopting the same 'curious mode' of construction, would be discredited in England, and it seems to me in reason should not be followed by us.

"In argument, much stress is laid upon the ability and learning of the English Judges.  I concede it all.  I would detract nothing from their world-wide reputation for ability and learning in the law; but I do say that the trend of the English courts, with all their greatness, is toward, if indeed they have not already come to, the position, to which every other court it seems to me must finally come, of construing an instrument conveying coal or minerals under the ground in identically the same manner in which other written instruments are construed, and in the same manner as instruments conveying any other species of property, free from presumptions or implied reservations not applicable to other instruments of conveyance.

"This being the true rule, we seek the intention of the parties to the instrument involved in this case, as the paramount end to be attained.  Certain rules of law applicable to contracts

are referred to, all of which will simply aid us in ascertaining the intention of the parties. All the provisions of the contract must be considered together. Then resort must first be had to the language used by the parties therein. As has been said, the contract of the parties is the law to them. The words are to be given their plain, ordinary and popular meaning, unless they have acquired a peculiar sense in respect to the particular subject matter, as by the known usage of trade or the like, or unless the context shows that the parties used them in some other and peculiar sense. 17 Am. & Eng. Enc. L., 11; *Railroad* v. *Chutte,* 103 U. S., 118. When the contract is thus considered, and it appears to be free from uncertainty and ambiguity, and the intention of the parties is apparent, the task is at an end. *Uhl* v. *Ohio R. Co.,* 51 W. Va., 106; Story on Contracts, section 780; 9 Cyc., 587; *Gibbony* v. *Fitzsimmons,* 45 W. Va., 334; Devlin on Deeds, section 837; *Salt Co.* v. *Campbell,* 89 Va., 396.

"Before the deed in question was made, the plaintiff was the owner of the fee and everything in the land in question. He might have removed the subjacent estate, and permitted the surface to subside. He might have destroyed both, or used them at his pleasure, so long as he did not injure another. What he might have done himself, he might grant to another the right to do.

"For a valuable consideration, the plaintiff granted the coal under the land in question, which means all the coal, and he granted certain mining rights and privileges, among which was the following: *'together with the right to enter upon and under said land and to mine, excavate and remove all of said coal.'* It will be observed that these words are not 'the common covenants of working in the usual and most approved mode,' or 'the common clauses giving full liberties of working and winning.' It cannot be said that the minds of the parties did not meet upon the removal of all the coal, when they so expressed it in the deed.

"If the right to support may be waived or excluded by contract, what kind of a contract is necessary for that purpose? The plaintiff granted all the coal, and the ownership of the surface and of the underlying coal was severed, creating a separate estate in each. If the deed said nothing more, the owner of each would be bound by the rule, *Sic utere,* etc., if

the deed said nothing more, I would without hesitation hold that the owner of the surface would be entitled to support, and that the owner of the coal could not so use it by removing all of it as to injure the surface. The deed does not stop with the grant of all the coal. It contains the express additional grant, on the part of the plaintiff, to the grantee, of the right to enter upon and under said land and to mine, excavate and remove all of said coal. It is contended that the conclusion reached in this case overlooks the fact that the law is a part of the contract so far as the parties have not otherwise contracted. I think it does not. I go further, and say that the parties to this contract are presumed to have known the law at the time they entered into it, and to have known that if the deed rested with the simple grant of all the coal and nothing more the grantor would then be entitled to support for his surface. Knowing the law, the parties undertook to further contract. The grantor being willing to give further privileges, and the grantee desiring further privileges, they placed in the deed a further provision granting the right to enter upon and under the land and to remove all of the coal conveyed. This intent gives effect to the additional grant; otherwise, it would seem to be meaningless, and not to grant more than a way of necessity, which the law would give without it. In fact, that is the position taken by the learned attorneys for the plaintiff. It is true that other mining rights are also granted, and the provisions granting them are not without meaning. But the particular grant of the right to enter upon and under the land, and mine and remove all of the coal, is virtually without meaning if it does not give to the grantee the right to remove all of the coal.

"I think there is a vast difference between a grant of all the coal simply, and a grant of all the coal together with the right to enter upon and under the land and remove all of it. Without a right to remove all, the owner of the coal may not do so, if to do would injure the surface.

"As to the waiver or exclusion of the benefit of the rule, *Sic utere,* etc., upon which alone the right to support rests, I ask in what more effective way may it be waived or excluded by the surface owner, than by positively agreeing or assenting, for a valuable consideration, to the specific use complained of? The plaintiff complains of the use by the removal of all. He

has by express, positive words, not by implication, agreed to the use of which he complains. No claim is made that the words used have any technical meaning, as applied to the subject matter of the deed. The words are intelligible to all. They mean the same to the linguist and the unlettered. If the English language were searched for words of consent or agreement to the removal of all the coal conveyed, I apprehend that none more appropriate could be found. Then, has the defendant so used ites property as to damage the plaintiff? According to the averments of the declaration, it has; but we cannot stop there. Has not the plaintiff consented and agreed to that specific use by his solemn deed, and thus been barred of his right to complain? If the plaintiff is injured by the performance of the contract, is it not *damnum absque injuria?* I must answer in the affirmative. So long as the constitutional guaranty of the right to contract exists, a man may so contract, and the contract must be respected by the court. If a party chooses by a binding contract to agree to an act resulting in damage to his property, he has the right to do so. It is a proper subject of contract. Can the plaitniff say, I have agreed in unequivocal terms to the specific use of the defendant's property of which I now complain, but *sic utere tuo ut alienum non laedas.* I have agreed to the act, anticipated the injury, and received the compensation therefor. May I not sue and recover the compensation again? I answer, most certainly not. To answer in the affirmative would be to say that the principle, *Sic utere,* etc., may be invoked to impair the obligation of a binding contract. No such application of this principle is authorized by law. It may not be used to perpetrate a fraud; neither may it be used against the express terms of a contract, or to impair or destroy its obligation.

" 'It is a general rule of law that no one can maintain an action for a wrong, where he has consented to the act which occasions his loss.' 8 Am. & Eng. Enc. L. 698; 1 Broom's Legal Maxims, 268, quoting Tindale, C. J.

"In other like cases, where a party has so contracted or consented, it would hardly be contended that he might, notwithstanding the contract, recover damages.

"If the owner of a building sell and convey the materials in

a story of the building, together with the right to remove all of them, may he afterwards complain of the removal of what he sold? If one sitting on a chair in his own home, sells that chair together with the right to remove all of it, and it is removed under the contract, may he afterwards complain because he has not the support of the chair as he had before the sale and removal? If one agrees that another may do a particular act, which otherwise would constitute a trespass to the former's property, and that act is done pursuant to the agreement, may he complain? It is hardly necessary to say that, in such cases, damages may not be recovered produced alone by the specific act agreed to, if there be no negligence or malice in the manner of doing the act. Illustrations might be multiplied indefinitely. The intention of the parties to the deed is apparent, certain and unambiguous, from the language used. The language of the deed gives the grantee the right to remove all the coal.

"It may be claimed that, although the grantee is given the right to remove all the coal, if he does so he should provide artificial support. As said by Baron Bramwell, this is impossible, owing to the expense. I doubt if it is possible to support a whole tract of land *modo et forma* by artificial means. It seems to me that there must be some subsidence, some settling, of the surface, if artificial support alone be resorted to. What has been said in relation to agreeing and consenting to the specific use, dispose of the question of artificial support as effectually as the question of natural support. Taking the deed as it is averred to be, we find no express covenant for artificial support. I do not think that artificial support was within the contemplation or intention of either of the parties when the deed was made. No language was used from which such intent may be implied. The court cannot make a contract for the parties, and cannot extend or enlarge one already made.

"Many of the English cases lay stress upon the fact that, under the particular instruments before them, the mining rights applied to acts to be done upon the surface of the land only. If anything were needed to show the contrary intent here, the word 'under,' when read with the rest of the deed, certainly performs that function. It cannot be said, if the word 'under' is to have effect, that it does not clearly mean that the rights

granted may be exercised under the land, and that the right of removal relates to the coal conveyed under the land. It may be claimed that the word 'under' should be excluded as repugnant. Why should it be excluded? The claim is that it is in conflict with the dominant and primary intent of the deed. Is this true? What is the primary or dominant intent of the deed? The primary or dominant intent is to convey the coal *under the ground, and the right* to remove all of it *under the ground* is not in conflict but consistent with this dominant intent. It is argued that the dominant intent of the deed is to reserve the surface. I cannot agree with that. The plaintiff does not own the surface by virtue of this deed. He was the owner of it before this deed was made. He derived title to it, as well as to the coal conveyed from some other source. He simply did not part with the surface by this deed, farther than therein specified.

No reservation of surface is expressed in the deed. It was not necessary to do so. I must give meaning and effect to the word 'under,' because I believe it is rational and consistent with the residue of the deed to do so. 'Rules of construction are adopted with a view of ascertaining the intention of the parties, and are founded in experience and reason, and are not arbitrarily adopted. They are not intended to make terms for the contracting parties, but simply to ascertain what the language means which they have employed in their contracts.' 2 Develin on Deeds, section 837.

"If, however, there were a doubt (which I do not concede) then the rule that the deed must be construed most strongly against the grantor is applicable. 'Where the grant shows the intention, even though ambiguously stated, following the rule that it is construed most strongly against the grantor, the right to surface support will be held not to exist.' Snyder on Mines, section 1032, and cases there cited. It is said that this rule, that a deed must be construed most strongly against the grantor, is the last rule to be resorted to, after everything else has failed, and for that reason it is inveighed against in argument. If it be the last, and there remains ambiguity after the others have been applied, it must certainly be applied before reaching a decision in favor of the grantor. It hardly seems fair to treat this rule so harshly, when we remember that we have a statute

(section 2, chapter 72, Code,) designed at least to emphasize and carry it into effect. Mr. Minor in his Inst., Vol. II, page 918, speaking of the like statute in Virginia, says that it 'seems to be designed to carry this principle of the common law yet further, although there has been as yet with us no judicial determination as to its construction. The enactment is that every deed conveying lands shall, unless an exception be made therein, be construed to include all the estate, right, title and interest whatever, both at law and in equity, of the grantor, in or to such lands.'

"I think the language used in the deed under consideration, no matter what may be the ground upon which the right to subjacent support is thought to be based, is sufficient to exclude the right to support. I would apply here the same rules of construction applicable to other instruments of like character conveying other property; no stronger, no weaker, but with the same effect upon all. This is the trend of many of the late cases and authorities and I feel that it is the true rule.

"Section 7, chapter 79, Code, is cited as bearing upon this case. In my judgment, it has no application.

"It is contended that the court should look at the hardship of a decision in favor of the defendant. If the contract is binding, the court cannot relieve against it, because of hardship alone. It is claimed by each side that great hardship will result, in case of an adverse decision. This may be true; but if true, it is a hardship of their own making.

"According to the declaration, the plaintiff's surface has subsided, and damage resulted. If the plaintiff was required to leave, of the coal conveyed to it, enough to support the surface, which is estimated at from one-fourth to one-half of the whole, then the part so left would be of no value in place to the defendant. Under our law, the defendant, being the owner thereof, must pay taxes on the portion left, through all the years to come. It is persistently urged that the modern and best methods of mining require the removal of all the coal for the benefit of the surface; that to do so permits the surface to reform and the remaining strata to re-unite, thus preventing the continuous draining of the water from the surface. This may or may not

be true; I do not know. If true, the damage to plaintiff's surface may not be so great as it otherwise would be."

We are not unmindful of the fact that the decisions of the courts of England and many of the courts of this country as respects this question are not in harmony with the decisions of the courts of West Virginia. Nevertheless, we find ourselves impelled to the conclusion that this difference is on account of the peculiar facts involved in this case and not because of the propositions of law announced by the courts to which we refer. It must be borne in mind that the decision of the West Virginia Court of Appeals will be held by the courts of that State to be a rule of property in that State in all suits that may be instituted between citizens of said State. If this court should decide otherwise, we would have a condition in that State, which would be without a parallel in judicial procedure. Under such circumstances, we would have one rule of property by which citizens of West Virginia would be governed and an entirely different rule of property where a suit was instituted by a non-resident of West Virginia in the Federal court. This would necessarily result in a great injustice and lead to interminable confusion; and, on that account, we would be inclined to adopt the rule of the West Virginia Supreme Court of Appeals, even if, in view of the peculiar provisions of the conveyance by which the land in controversy was transferred, we did not find ourselves in accord with that tribunal. For the reasons stated we are of the opinion that the learned judge who heard this case was not in error in sustaining the demurrer filed therein. Therefore the judgment of the lower court is

*Affirmed.*