MARQUETTE CEMENT MINING CO. v. OGLESBY COAL CO.

(District Court, N. D. Illinois, E. D.    September 7, 1918.)

1. DEEDS ⬯100—CONSTRUCTION—EXTRINSIC CIRCUMSTANCES.
   To aid in the construction of deeds, evidence of all the surrounding circumstances is admissible to show the situation and relation of the parties and what they sought to materially accomplish.

2. MINES AND MINERALS ⬯55(6)—GRANTS OF MINING RIGHTS—CONSTRUCTION.
   The right of support is vital to the owner of the surface and strata overlying a mine, and is not presumed to have been given up by a conveyance of mining rights unless expressly or by strong implication.

3. MINES AND MINERALS ⬯122—GRANTS OF MINING RIGHTS—CONSTRUCTION —"SURFACE."
   The word "surface" in mining controversies means that part of the earth or geologic section lying over the minerals in question, unless the contract or conveyance otherwise defines it, and the owner of a higher stratum is entitled to the same right of support as the surface owner.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Surface.]

4. MINES AND MINERALS ⬯55(6)—GRANTS OF MINING RIGHTS—CONSTRUCTION.
   A provision in a conveyance of coal mining rights excepting coal under that portion of the surface occupied by buildings of the grantor did not, by implication, permit mining in such manner as to cause subsidence of the surface or overlying strata on other parts of the tract.

5. MINES AND MINERALS ⬯55(6)—GRANTS OF MINING RIGHTS—CONSTRUCTION.
   A deed conveying the right to mine coal under a tract of land "without entering upon or injuring the surface thereof" requires the mine to be so worked as not to let down the surface.

6. COURTS ⬯367—GRANTS OF MINING RIGHTS—RULES OF PROPERTY.
   Where mining rights are granted in view of a local rule of the state, such rule will be followed by the federal courts in construing the grant, whether or not it is to be considered strictly as a rule of property.

7. MINES AND MINERALS ⬯55(6)—SEVERANCE OF TITLE TO MINERAL—RIGHTS OF SURFACE OWNER.
   Under the law of Illinois, as by the general common law, where the underlying minerals are severed by conveyance from the surface the owner of the surface has a clear right to its support.

8. NEGLIGENCE ⬯100—CONTRIBUTORY NEGLIGENCE—WHEN PROVABLE AS DEFENSE.
   Contributory negligence is not a defense to an action for breach of an absolute legal duty.

9. MINES AND MINERALS ⬯125—INJURY FROM WORKING—INJUNCTION—REMEDY AT LAW.
   Where the mining of coal by defendant causes subsidence which seriously interferes with complainant's mining in a higher stratum of limestone, causing damage, and will continue to do so to an extent which cannot be measured, the remedy at law is not adequate and does not exclude jurisdiction in equity.

10. INJUNCTION ⬯137(2)—PRELIMINARY INJUNCTION—BALANCING OF INJURY.
    The rule as to balancing of injuries, to be considered in some cases upon application for preliminary injunction, does not apply where the right and its breach are clear.

11. EQUITY ⬯61—RIGHT TO RELIEF—LEGAL STATUS OF PARTIES.
    When each party is pursuing his own right, and collision results, the one without legal culpability of any kind must prevail if the other occupies legally indefensible ground.

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Marquette Cement Mining Company against the Oglesby Coal Company. Decree for complainant.

Tenney, Harding & Sherman, of Chicago, Ill., and Duncan & O'Connor, of Ottawa, Ill., for plaintiff.

Adams, Crews, Bobb & Wescott, of Chicago, Ill., for defendant.

SANBORN, District Judge. This is a bill for an injunction by the owner of a limestone cement mine to restrain the defendant from so operating its mine situated directly beneath the former as to remove the subjacent support. It is conceded, and shown by the evidence of both parties, that there is an actual subsidence of 20 to 25 inches. The defendant, while admitting subsidence, contended on the trial, and gave evidence tending to show, that it was so gradual that the damage occurring in plaintiff's mine was not caused by such subsidence, but resulted from a careless and improper manner of mining the cement rock. It was decided at the trial, however, that certain of the damage was caused by the subsidence, particularly on account of the uneven or differential lowering of the strata of rock and shale underlying the limestone stratum in which the cement mine is operated. Certain other injuries in the cement mine have been due to the plaintiff's method of mining, in not leaving pillars of sufficient size to support the overburden, or by mining shale underneath the pillars, and thus leaving insufficient support. It remains only to recite enough of the facts to aptly apply the governing rules of law, after an examination of the legal principles properly applicable.

Defendant's position is that the suit for injunction cannot be maintained because the remedy at law is adequate, and it is therefore entitled to a trial of the facts by a jury, under the third amendment to the federal Constitution and section 120 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1132 [Comp. St. 1916, § 1112]). It further contends that subsidence was authorized by the dealings of the parties, it being understood that the coal could not otherwise be taken out, and that the correspondence and contract leading up to the conveyances passing between the parties, by which the cement mine and the coal seam were severed, as well as those conveyances themselves, recognized the right of subsidence by the defendant. A further claim, that all the injuries to the cement mine were caused by negligent and improper mining methods pursued by plaintiff, was decided at the trial in respect to portions of the mine in plaintiff's favor, as already referred to.

The property in question is at Oglesby, Ill., in the La Salle geological region, and the strata of limestone, coal, shale, etc., are sedimentary deposits. The plaintiff's mine is about 100 feet below the surface, and the coal seam now being mined by defendant is about 500 feet below the other. From the surface down to the cement mine the geologic section is glacial drift and various sorts of shale and clay. Then comes the limestone bed, about 40 feet thick, composed irregularly of nodular limestone (hubbly limestone and shale), fine-grained limestone, and crystalline limestone, with two thin horizontal shale partings. The mine floor is shaly limestone or soapstone under-

laid with shale, supported by a thin layer of hard thin-bedded black shale or slate. This floor is of varying thickness, from 4 to 15 feet; and below it, down to the coal seam in question, are conglomerate rock, soft clay shales, some silty or sandy, hard shales, coal seams seven and five, green and grey shales, some very hard shale, a thin layer of limestone, and some 20 feet of tough, hard, shale composing the roof of the coal mine. The various layers are quite generally horizontally disposed to each other, and seams and partings abound. During the slow process of settlement due to subsidence, it is supposed that the shales, rock, and other kinds of earth move or slide on each other, finding their final adjustment in much the same form as before, though in a more blocky condition. Upon this the geologists, mining engineers, and miners who testified for defendant based their opinion that the subsidence caused no damage to the plaintiff's mine.

Plaintiff's mining is carried on by the room-and-pillar or pillar-and-stall system, by the advancing and not the retreating plan, the final step being to get as much material as possible by robbing the pillars and roof coming back. Defendant uses the long-wall system. The former consists in beginning at the mine opening, cutting tunnels or entries in the limestone ledge, and taking off rooms from them, leaving a limestone roof of varying thickness, theoretically sufficient to sustain the hundred-foot overburden when pillars of sufficient size are allowed to remain. When the boundary is reached such part of the pillars and roof is taken as is practicable as the work recedes. The work commenced in a small way some 30 years since, and for a long time the rooms were made larger than the best mining practice required. Within the last two or three years the entries and rooms have been made smaller and the pillars larger. Since the making of cement requires a certain amount of silica, found in the shales, the floor of the rooms was mined in certain parts for this purpose, and in places the pillars settled, causing floor heaving and cracking, roof-cracks, roof-falls, spawling, and some cave-ins. These occurred mainly in parts where there was no coal mining near enough to have any influence, and are not claimed to have been caused by it. Others are claimed to be wholly or partly due to the subsidence, and these, particularly the Hand cave and the Calumet Entry cave, will be mentioned presently.

*The Title to the Two Mines.*—That part of the cement mine which is now being worked consists of a tract about 7,000 feet long, roughly estimated at 200 acres. A part was originally owned by plaintiff and a part by defendant, and they arranged to sever the ownership by having the coal rights in plaintiff's land conveyed to defendant, plaintiff retaining all the rest, and, where defendant was owner, by having the fee conveyed to plaintiff, reserving the coal and the right of removal.

In the negotiations and writings leading up to these conveyances, as well as in the deeds themselves, it is claimed by defendant that there is an implied understanding that defendant might remove the coal even though subsidence was caused. These negotiations were

begun by a letter of August 3, 1904, from defendant to Mr. N. W. Duncan, an officer of the plaintiff. In this letter it was proposed that the parties sever their respective ownership in the following manner: Defendant proposed to convey the cement rock and clay lying within 75 feet of the surface, with the right to mine them without entering upon the surface, and in the process of mining pillars of a specified size should be left, but no covenant not to injure the surface should be required. Mr. Duncan, it was proposed by this letter, should convey to defendant the coal and other minerals, not including cement rock and clay lying within 75 feet of the surface, with the right to mine the coal without entering upon or injuring the surface, Duncan to reserve such part of the coal and other minerals as might underlie the cement plant.

After negotiations covering some time, conveyances were made to and from each party. Deeds from plaintiff or its grantors to the defendant described the No. 2 coal seam, and so much of the rock, clay, and other minerals just above and just below the vein of coal as might be required in connection with the mining and removing of the coal, together with the right to mine and remove the same, and the adjacent rock, clay, and other minerals, "without entering upon or injuring the surface thereof," excepting the coal under a tract 200 feet wide by 600 feet long under plaintiff's manufacturing plant. Deeds made by defendant to plaintiff excepted the coal and minerals just above and below, with the same right to mine and remove it "without entering upon or injuring the surface thereof." Most of the deeds back and forth contain like provisions, but those which do not seem to be unimportant on the questions of construction and are not particularly stated.

*Effect of Subsidence from Coal Mining.*—After mining cement rock for many years, and having practically no trouble in the mine, in 1910 roof-falls, pillar-cracks, and floor-heaves commenced to appear, followed in some cases by cave-ins to the surface. The first cave-in was the Garage cave, May 15, 1910, followed by the Riley cave, September 18, 1910, a small cave on the south boundary in 1912, and two caves nearby in 1913. All these were caused by shale mining and not by coal mining. On September 10, 1913, occurred the Hand cave, the largest of all. At this time the coal face was approaching, but did not reach the immediate vicinity until February, 1914. The pillars left in this area were quite small, and the testimony leaves it uncertain whether the trouble was caused wholly by subsidence, but it was probably due both to that and the methods of mining. Early in 1914 an entry about 700 feet long and 35 feet wide, known as the Calumet entry, was driven in the solid rock in the western part of the mine immediately under the advancing coal mining face, and in December, 1914, the whole tunnel fell, in the course of a few days. The testimony leaves no doubt that this was caused by subsidence.

There were other distinct cave-ins in the region of the advancing coal face which were caused in part by subsidence, and in part by small pillars, shale mining, or both.

The most clear evidence of injury caused by subsidence is in the northwestern part of the mine, from the Hand cave region to the northeast corner. After the Calumet entry disaster plaintiff employed engineers to endeavor to locate the cause or causes of the injury. Surveyors' monuments were set upon the surface, and in the mine, in considerable numbers. Readings were taken of their position at frequent intervals, and in this way subsidence was detected and measured. In the region of subsidence there were constant and continuous roof-falls, many of a serious character, and much damage to pillars and floor. All these have continued to the present time, and were going on in the same way down to the close of the trial. The evidence of these injuries, and their connection with subsidence, are numerous. They are in the area above the advancing coal face, and are absent in other parts of the mine; such injuries as there occur are due to local causes. There is also observed the absence of any important injury where subsidence has become complete and the earth has reached its final settlement. The injuries referred to as caused by subsidence cannot be attributed to floor weakness, excessive overburden, the presence of water, the character of the limestone, blasting with dynamite, or a "squeeze" or "creep" from the Hand cave. The mine is an exceptionally dry one, and the evidence shows that, while loose shale is quickly disintegrated by water, it is not so when under pressure. Added to all this is the fact, clearly demonstrated by the evidence, that the subsidence is a differential one. It is hardly possible to think of an uneven sinking of the support of a series of rooms and pillars without the necessity of serious damage. How can one pillar sink while another 50 feet away is stationary without the twisting, straining, and cracking described in the testimony? It is indeed possible to conceive that such a differential subsidence might occur in an untouched area in its natural state which would not cause much injury; but it must be otherwise in a ledge from which three-fifths of the rock has been taken out, the remainder having been left in the form of roof, pillars, and floor.

[1] *The Construction of the Deeds.*—Evidence of all the surrounding circumstances was properly submitted to show the situation and relation of the parties, and what they sought to materially accomplish. Butterley Co., Ltd., v. New Hucknall Colliery Co., Ltd., 99 L. T. 818 (A. D. 1908), 102 L. T. 609 (A. D. 1910); Beard v. Moira Colliery Co., Ltd., 112 L. T. 227 (A. D. 1914); Jones v. Consolidated Anthracite Collieries, Ltd., 114 L. T. 288 (A. D. 1915).

[2] The right of support is vital to the owner of the overlying surface and strata. Therefore it is not presumed to have been given up unless expressly or by strong implication. Wilms v. Jess, 94 Ill. 464, 34 Am. Dec. 242; Kansas City N. W. R. Co. v. Schwake, 68 L. R. A. 675, note 1; Catron v. South Butte Min. Co., 181 Fed. 941, 104 C. C. A. 405.

[3] The word "surface" in mining controversies means that part of the earth or geologic section lying over the minerals in question, unless the contract or conveyance otherwise defines it. It is not merely the top of the glacial drift, soil, or the agricultural surface. Humphries

v. Brogden, 12 Q. B. 739. The owner of the higher stratum is entitled to the same rights as the actual surface owner. Yandes v. Wright, 66 Ind 319, 32 Am. Rep. 109. See 68 L. R. A. 679; Robertson v. Youghiogheny River Coal Co., 172 Pa. 566, 33 Atl. 706; Mundy v. Rutland, L. T. 23 Ch. Div. 81.

[4] There is nothing in the letters, negotiations, or deeds which gives a different meaning to the word "surface," or, either expressly or by implication, secures to the defendant the right to subside the overlying cement mine. On the whole, the implication is to the contrary by reason of the deeds giving the right to mine and remove coal "without entering upon or injuring the surface." All the restrictions are upon defendant's right to mine and not upon the plaintiff. Nor do the preliminary negotiations indicate an intention to waive the right of support. It is highly improbable that the plaintiff would intentionally agree that the relatively unimportant agricultural surface should be preserved, while assenting to the letting down of its enormously valuable rock ledge and mine. That it was careful to protect its manufacturing plant beyond all question is not a clear implication of its consent to subside its mine. As the court said in Wilms v. Jess, supra:

"But, it is contended, appellant and his codefendant were exonerated from protecting the surface, because the lease here stipulates that 'no pillars shall be withdrawn within six hundred feet of the shaft,' upon the principle that, 'having expressed *some* the parties have expressed *all* the conditions by which they intend to be bound under that instrument.'

"By looking to the lease, we think it quite clear this stipulation has relation to the mine only, and no reference whatever to the superincumbent soil. The whole clause relates to the manner of working the mine and the condition in which it shall be left. It requires that the mining shall be done in a workmanlike manner, that no pillars shall be withdrawn within six hundred feet of the shaft, and that the entries giving access to the coal not mined at the termination of the lease, shall be turned over, etc., in good condition, etc.—all for the obvious purpose of preserving the shaft and access to coal not mined.

"No attempt is made to regulate the rights and obligations of the parties, in respect of the superincumbent soil, further than to confer the right of way thereover and the surface use to the extent necessary to an efficient and economical working of the mine, leaving them to be governed in other respects in reference thereto by the common law."

In the English cases cited it was ruled that the parties, by their agreements in the leases or conveyances by which their ownerships were severed or secured, had agreed that the lower owner might remove the right of support, the provisions for this purpose giving rise to a clear implication. Thus, in the Butterly Case, plaintiffs owned the top seam of hard coal, and defendants the deep, soft seam, 150 yards below. It was common knowledge at the time the interests were created (as in this present case) that the lower seam could not be worked without causing subsidence. The lease of the upper seam contained a provision that the lessor might lease the lower or soft coal seam to others, and should in such leases indemnify against any physical damage caused by the working of such lower mine. Later the lessor leased the soft seam to defendants, who worked the mine and caused damage to the plaintiff by subsidence, for which it rendered bills to the lessor, which were paid. It also appears from the various reports of the decision that the defendants claimed the

right, under the leases, to subside the surface, including the upper seam, on paying plaintiff for the damage caused. It was held that the plaintiff had no right to an injunction, but only to such compensation for subsidence as had been agreed upon. It was also assumed in the opinions in the Butterly Case that the subsidence would only make the working of the upper mine more expensive without stopping the mining altogether, but I find this would not be the result in the case at bar. There was also a provision in defendants' lease that they would work the mine in the most approved manner, which was held inconsistent with the right of the plaintiff to have an injunction against their working it at all.

In the Beard Case cited the landowner conveyed certain real estate, reserving all minerals, with the power to mine them "in as full and ample a way and manner as if these presents had not been made and executed." It was also provided in the deed that the grantor should pay at the rate of $20 a year per acre of land undermined. The former decisions were followed, and the right to continue mining affirmed. The following statement of the law by Lord Loreburn in Butterknowle Colliery Co., Ltd., v. Bishop Auckland, etc., 94 L. T. 793, was approved:

"Whenever the minerals belong to one person and the surface to another, the law presumes that the surface owner has a right to support, unless the language of the instrument regulating their rights, or other evidence, clearly shows the contrary. In order to exclude a right of support, the language used must unequivocally convey that intention, either by express words or by necessary implication. For the same presumption in favour of a right of support which regulates the rights of parties in the absence of an instrument defining them will apply also in construing the instrument when it is produced. If the introduction of a clause to the effect that the mines must be worked so as not to let down the surface would not create an inconsistency with the actual clauses of the instrument, then it means that the surface cannot be let down."

[5] In the case now under consideration the provision in the deeds that Oglesby Company shall not enter upon or injure the surface amounts to a clause that the coal mine shall not be worked so as to "let down the surface," and such provision does not create any inconsistency with the one giving it the right to mine and carry away.

The Jones Case, also cited, related to damage to buildings on the surface, and there was the same provision as to compensation, to the effect that reasonable compensation should be made, for injury "whether by letting down the surface or otherwise."

The result of an examination of the English authorities cited on the argument seems to be that the rules are similar to those adopted in this country, yet there is here a stronger tendency in favor of the right of subjacent support than in the High Court of Judicature in England.

[6] *The Governing Rule of Law is that of Illinois.*—In 1880, long before the conveyances of severance between the parties here were made, the rule as to subjacent support was settled in Illinois by the case of Wilms v. Jess, 94 Ill. 464, 34 Am. Dec. 242, substantially reaffirmed by Lloyd v. Catlin Coal Co., 210 Ill. 460, 71 N. E. 335. The former decision is commented on in other parts of this opinion. Since

253 F.—8

the conveyances were made in view of the local rule the federal courts will follow it, whether or not it is to be considered strictly as a rule of property. Any other rule would be intolerable, as applied to the ownership and enjoyment of property. Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 526, 59 L. Ed. 856; Kuhn v. Fairmont Coal Co., 215 U. S. 349, 30 Sup. Ct. 140, 54 L. Ed. 228; Id., 179 Fed. 191, .102 C. C. A. 457, 66 W. Va. 711.

[7] The Illinois rule, as so established, is that the right of support is absolute, a substantive part of the mass of rights constituting ownership of land. It is not an incident of ownership nor an easement. In Wilms v. Jess a lease was made of the exclusive right of boring and digging for coal, and for "taking out and working the said coal, together with the right of way and surface of so much of the track [sic] as may be necessary for the economical use of the same." "It is further understood and agreed that the said party of the second part shall mine the coal in a workmanlike manner, no pillars to be withdrawn within six hundred feet of the shaft, and. that the entries giving access to the coal not mined at the termination of this lease shall be turned over to the party of the first part in as good condition as the nature of the mine will admit." The court say:

"The lease under which appellant claims, confers the right to work the mine and take out the coal, and, as incident thereto, the use of usual and appropriate means therefor; and it also gives a right of way and surface use of so much of the superincumbent soil as is necessary for the economical and efficient working of the mine. It does not, however, assume to confer any right to destroy or injure or further burden the superincumbent soil.

"Where the surface of land belongs to one and the minerals to another, no evidence of title appearing to regulate or qualify their rights of enjoyment, the owner of the minerals cannot remove them without leaving support sufficient to maintain the surface in its natural state. Humphries v. Brogden, 12 Queen's Bench, 743 (1 Eng. Law & Equity, 241); Harris v. Ryding, 5 Meeson & Welsby, 59; Smart v. Morton, 5 Ellis & Blackburn, 30.

"But, it is contended, appellant and his codefendant were exonerated from protecting the surface, because the lease here stipulates that 'no pillars shall be withdrawn within six hundred feet of the shaft,'·upon the principle that, 'having expressed *some* the parties have expressed *all* the conditions by which they intend to be bound under that instrument.'

"By looking to the lease we think it quite clear this stipulation has relation to the mine only, and no reference whatever to the superincumbent soil. The whole clause relates to the manner of working the mine and the condition in which it shall be left. It requires that the mining shall be done in a workmanlike manner, that no pillars shall be withdrawn within six hundred feet of the shaft, and that the entries giving access to the coal not mined, at the termination of the lease, shall be turned over, etc., in good condition, etc. —all for the obvious purpose of preserving the shaft and access to coal not mined.

"No attempt is made to regulate the rights and obligations of the parties in respect of the superincumbent soil, further than to confer the right of way thereover, and the surface use to the extent necessary to an efficient and economical working of the mine, leaving them to be governed in other respects in reference thereto by the common law.

"The rule is well settled, when one owning the whole fee grants the minerals, reserving the surface to himself, his grantee is entitled only to so much of the minerals as he can get without injury to the superincumbent soil. Coleman v. Chadwick, 8 Pa. St. 81 [21 Am. St. Rep. 93]; Horner v. Watson, 29 P. F. Smith [Pa.] 251 [21 Am. Rep. 55]; Jones v. Wagner, 10 [16] Id. 429 [5

Am. Rep. 385]; Harris v. Ryding, supra; Zinc Co. v. Franklinite Co., 13 N. J. (2 Beasely's Ch.) 342; Smart v. Morton, supra.

"And it is held, where a landowner sells the surface, reserving to himself the minerals with power to get them, he must, if he intends to have power to get them in a way which will destroy the surface, frame the reservation in such a way as to show clearly that he is intended to have that power. Hext v. Gill, 7 Law Reports, Chancery Appeal Cases, 699.

"But, it is contended, this obligation to protect the superincumbent soil only extends to the soil in its natural state, and that no obligation rests on the owner of the subjacent strata to support additional buildings, in the absence of express stipulation to that effect. This is, doubtless, true; but 'the mere presence of a building or other structure upon the surface does not prevent a recovery for injuries to the surface, unless it is shown that the subsidence would not have occurred except for the presence of the buildings. Where the injury would have resulted from the act if no buildings existed upon the surface, the act creating the subsidence is wrongful, and renders the owners of the mines liable for all damages that result therefrom, as well to the buildings as to the land itself.' Wood on Nuisance, § 201; Brown v. Robins, 4 Hurlstone & Norman, 185; Hamer v. Knowles and another, 6 Hurlstone & Norman, 459.

"The act of removing all support from the superincumbent soil is, prima facie, the cause of its subsequently subsiding; but if the subsiding is, in fact, caused by the weight of buildings erected subsequent to the execution of the lease of the mine, this is in the nature of contributive negligence, and may be proved in defense. The authorities do not require that plaintiff's proof shall exclude that hypothesis in the first instance."

This is the law of the state where the mines are situated and that law the court should follow. The case also conforms, I think, to the trend of authority in other states as well as in the British Empire. Where the underlying minerals are severed by conveyance from the surface, the owner of the latter has a clear right to the support of the surface. Scitz v. Coal Valley Coal Mining Co., 149 Ill. App. 85; Noonan v. Pardee, 200 Pa. 474, 50 Atl. 255, 55 L. R. A. 410, 86 Am. St. Rep. 722; Donk Bros. Coal & Coke Co. v. Novero, 135 Ill. App. 633; Penman v. Jones, 256 Pa. 416, 100 Atl. 1043; Jones v. Wagner, 66 Pa. 429, 5 Am. Rep. 385; Humphries v. Brogden, 12 Q. B. 739, 64 E. C. L. 739, 17 Eng. Ruling Cas. 416; 18 Am. & Eng. Ency. Law, § 556; 1 R. C. L. § 34, p. 395; Wood, Nuisances, 194; 3 Lindley, Mines (3d Ed.) §§ 818, 819; White, Mines & Mining Injuries, §§ 212, 215; Costigan, Mining Law, pp. 504–506; 2 Snyder on Mines, §§ 1020–1025; MacSwinney on Mines, 291: Williams v. Gibson, 84 Ala. 228, 4 South. 350, 5 Am. St. Rep. 368; Marvin v. Brewster Iron Min. Co., 55 N. Y. 538, 14 Am. Rep. 322; Lord v. Carbon Iron Mfg. Co., 42 N. J. Eq. 157, 6 Atl. 812; Erickson v. Michigan Land & Iron Co., 50 Mich. 604, 16 N. W. 161; Carlin v. Chappell, 101 Pa. 348, 47 Am. Rep. 722; Williams v. Hay, 120 Pa. 485, 14 Atl. 379, 6 Am. St. Rep. 719.

*Effect of Plaintiff's Mining Methods.*—Defendant in its answer admits that plaintiff has suffered serious damages in its mining operations, but alleges that this is due to "its notoriously reckless, unworkmanlike, and unscientific methods of mining, in violation of well-established mining practice and sound engineering judgment." The proof shows that in some parts of the mine the pillars are too small, and that shale has been mined so as to further weaken them, and that

this has been followed by injury in no way caused by subsidence. In other places this method of mining has contributed to such injury. In still others, particularly in the western, southwestern, and northwestern part of the east portion of the mine the injury is wholly due to subsidence. Plaintiff started its operations many years ago, when the science was not so advanced as at present. It has employed skilled workmen, its foreman and superintendent, Spurr and Moyle, being men of exceptional character and experience. Since troubles from subsidence commenced it has employed as mining engineer Mr. Shultz, most able and well equipped for his work, and who has much improved on the mining practice. I find as a matter of fact that the injuries on the southwest entry and haulage, with the exception of the extreme southerly ends, the Calumet entry, and the northwest part of the east portion of the mine, were due alone to the subsidence, and that most serious injury will follow the advancing coal face to the east and southeast; also that the method of plaintiff's mining did not contribute to the injuries in these parts, although the contrary is true as to the portion northwest, north, and northeast of the main entry to the mine, and that in this region the mining methods were not such as would at this day be approved.

[8] As to the effect of such negligence it is not necessary to decide, since I find that the continuance of coal mining will vitally injure territory in which the mine practice is good and sufficient. However, no charge of negligence is made against defendant, simply the breach of an absolute legal duty. In such a case the only defense, aside from laches or release of such duty, or some other defense not alleged (such as estoppel), is that the subsidence caused no injury. Contributory negligence (as the term implies) is a defense only when a party omits something in his operations which common prudence requires—a breach of negative duty. The rule seems never to have been applied to cases of absolute duties, like the statutory obligation of railroads to fence their right of way against domestic animals, except when the owner, seeing them on the track before an approaching train, deliberately refuses to remove them. Donovan v. Hannibal, etc., R. Co., 89 Mo. 147, 1 S. W. 232; Zimmerman v. H. & St. J. R. Co., 71 Mo. 476. To this extent only is the rule of "the last clear chance" applied to the negligent breach of absolute legal duty. The inapplicability of these rules to the present case seems obvious. In a general sense, it is true, defendant may be said to be negligent in not propping up its mine so as to prevent subsidence. Defendant might possibly leave pillars of coal sufficient to support the surface, but I assume that would be entirely impracticable under a prohibitive expense.

I think the objection or argument that the law of support applies only to land in its natural state, and not to a weakened structure like the cement mine, rendered more susceptible to injury by having more than half of the rock removed, has no application to the case. I find as a fact that the injuries would have occurred even if the mining methods had been the same as those now in use, which are above criticism. The subsidence was the wrongful cause of the injuries,

the sole proximate cause. The rule of law held in the Wilms Case, 94 Ill. 464, 34 Am. Dec. 242, herein quoted, should be followed.

[9] *Is the Remedy at Law Adequate.*—By the Seventh Amendment to the Constitution, the right of jury trial in cases at common law is preserved, and, if the present case should properly be a legal one, defendant has a settled right to a jury trial upon the question whether the conceded subsidence actually causes injury, as well as upon all other facts. The same rule was adopted by the Judiciary Act of 1789, now found in section 723, R. S., and section 267 of the Judicial Code (Comp. St. 1916, § 1244). Later legislation provides that a suit brought in the wrong forum shall be transferred to the proper side. Sections 274a, b, c, Judicial Code and Equity Rule 22 (198 Fed. xxiv, 115 C. C. A. xxiv).

It is the settled rule that the remedy at law, to be an adequate one, must be as certain, prompt, complete, and efficient to the ends of justice and its prompt administration as the remedy in equity. Texas Co. v. Central Fuel Oil Co., 194 Fed. 1, 114 C. C. A. 21, and cases cited. This was specific performance of a contract for the delivery of crude petroleum at the rate of not more than 20,000 barrels a day, and the alleged breach was a refusal by the Central Company to perform. An injunction was prayed to prevent violation. Equity jurisdiction was sustained, because plaintiff could not recover all the damages it might sustain, and because they were impossible of proof, the amount of oil which the defendant could produce being uncertain. So in this present case no one can tell what damage the cement company may sustain by future subsidence. Future actions at law would be necessary as the injury progressed. Recurring suits for damages would be more vexatious and expensive than effective. United States Freehold Co. v. Gallegos, 89 Fed. 769, 32 C. C. A. 470, where there was a continuous diversion of water; Northern Pac. Ry. Co. v. Cunningham (C. C.) 103 Fed. 708, a continuing trespass by the pasturing of sheep. One person cannot be permitted to continuously damage another and compel the owner to accept money in satisfaction. "The rule applies with special force when the threatened trespass would result in depriving the complainant of the enjoyment of a property right." West Virginia Pulp & Paper Co. v. Cheat Mountain Club, 212 Fed. 373, 129 C. C. A. 49. The removal of granite from a quarry was restrained pending a decision by the land department, for the reason that the injury might be irreparable. Northern Pac. Ry. Co. v. Soderburg (C. C.) 86 Fed. 51; Wallula Pac. Ry. Co. v. Portland & S. Ry. Co. (C. C.) 154 Fed. 902. In the present case the testimony establishes the fact that the injury already sustained and to result from continued coal mining is an irreparable one.

A decision relied on by defendant is Berkey v. Berwind-White Coal Mining Co., 220 Pa. 65, 69 Atl. 329, 16 L. R. A. (N. S.) 851. A conveyance had been made of a coal stratum, with the right to mine and remove it. An injunction was sought to restrain the coal owner from so mining as to subside the surface. The jurisdiction was denied on the ground that the anticipated injury was not ir-

reparable. The court said that if the act to be committed was in the nature of a trespass, or tort, or nuisance, which by reason of the persistency with which it is repeated threatens to become permanent, courts of equity will interfere by injunction; citing Pennsylvania cases. Then the court continues:

"The present case does not come within the reason or spirit of the rule announced in these cases. Under the facts of the case at bar it cannot be successfully contended that the injury is irreparable, at least in the sense that it cannot be adequately compensated in damages; and certainly the mining and removing of coal by the party who owns it and has the right to remove it, and whose operations are conducted by the most approved methods known in mining operations, cannot be said to be a trespass, or tort, or nuisance, within the meaning of the rule of the above-cited cases in which equitable relief has been granted. In the above cases the respondents were trespassers, without any right of property in the thing injured, while in the present case appellants are the owners or lessees of the coal with the right to remove it."

"It is often difficult to determine whether the remedy at law is adequate, and in passing upon this question equity jurisdiction has been extended from time to time by our courts. A court of equity, in passing upon the question whether the remedy at law is adequate, should have due regard to the situation of the parties. The case at bar is an illustration. The appellee sold and conveyed all of his coal to one of the appellants, which leased it to the other, and has been paid the consideration in full. By his express covenant the mining company is given the right to mine and remove all the coal, so that when, in the prosecution of its mining operations, it undertakes to mine and remove the entire stratum, it is only doing what the appellee, in the express language of his covenants, said could be done. A rule of law, as old as the commonwealth, comes to his aid by charging upon the underlying mineral estate the servitude of surface support, in the absence of the waiver of this right in the grant. The law has thus done for him what he has not done for himself. Of course, he is entitled to have his rights protected, no matter how they arise; but his vendee and its lessee, the appellants here, on the other hand, must also be protected in the enjoyment of the rights acquired under the deed of conveyance. This was the situation of the parties at the time of the filing of the present bill. The appellants have the title to all the coal, with the right to mine and remove it. The appellee, under the rule of law above referred to, had no title to the coal or any part of it, but only the right to have his surface sufficiently supported. In a sense, both parties are standing upon their legal rights. It was not for the appellee to say how much coal should be mined and removed, because the coal did not belong to him. He can insist upon his right to have the surface reasonably supported, and if this is not done, and injury results by failure in this respect, he can recover damages to the full extent of the injury done. None of our cases have gone further than this up to the present time. We are now asked to take a step in advance by recognizing the right of the owner of the surface to proceed in a court of equity to restrain the owner of the coal from mining and removing it in such a manner as may cause subsidence or breaking of the surface. In other words the court is asked to restrain a mining company from mining its own coal because it may reasonably be anticipated that the removing of the coal will cause a subsidence or breaking in the surface. Such a remedy would be a proper one if the facts of a particular case warranted such intervention. If the threatened injury is of an irreparable character, which could not be compensated in damages by an action at law; or if buildings or other permanent improvements would be endangered; or if overlying strata of coal, or other mineral estate, would be seriously and permanently disturbed or displaced by the mining of all the coal—it is clear equity would in proper case intervene to restrain such acts, even before the injury had been done. But none of these conditions are shown to exist in the present case. The coal has already been mined from the lower and more level parts of the tract, and the coal yet to be mined is overlaid with a hilly surface furnishing a covering from 200 to

250 feet thick. The vein of coal varies from 3 feet 6 inches to 4 feet in thickness, and the evidence produced at the hearing, as well as the experience of all those familiar with mining operations, shows that very little, if any, damage will be done that part of the surface by mining and removing the coal. The loss of springs of water is principally relied on by complainant to show damage to his surface, but the evidence is not sufficient, in our opinion, to establish the fact that the springs were affected by failure to furnish surface support. Springs of water are frequently affected by the mining of coal even when the surface is properly supported, and under the facts of the present case the weight of the evidence would seem to show that failure to provide surface support was not the cause of the springs drying up. As to the buildings, the evidence is clear that the coal has not been mined from under the same, and therefore it cannot be said that any damage has been done to them from this cause. If at any time the appellants should undertake to mine the coal from under the buildings or other permanent improvements in the tract, the owner could prevent the same by injunction. The appellants deny that they have mined the coal from under the buildings, and aver that it is not their intention to do so, and under these facts a case for equitable relief is not made out in this respect."

It seems to me that the foregoing discussion clearly shows that in case of irreparable injury equity has jurisdiction. Other cases sustaining the jurisdiction are El Doro Oil Co. v. United States, 229 Fed. 946, 144 C. C. A. 228; Archer v. Greenville Gravel Co., 233 U. S. 60, 34 Sup. Ct. 567, 58 L. Ed. 850; Big Six Development Co. v. Mitchell, 138 Fed. 279, 70 C. C. A. 569, 1 L. R. A. (N. S.) 332; Eastern Oregon Land Co. v. Willow River L. & T. Co., 201 Fed. 203, 119 C. C. A. 437; Oolagah Coal Co. v. McCaleb, 68 Fed. 86, 15 C. C. A. 270; United States v. Midway & N. Oil Co. (D. C.) 232 Fed. 619, 624; Peck v. Ayres & Lord Tie Co., 116 Fed. 275, 53 C. C. A. 551; Lembeck v. Nye, 47 Ohio St. 336, 24 N. E. 686, 8 L. R. A. 578, 21 Am. St. Rep. 828.

Manifestly an injunction of such grave import as that here sought should not be granted except in a clear case. Lloyd v. Catlin Coal Co., 210 Ill. 460, 71 N. E. 335. But when it is clear that subsidence will seriously impair the mining use, the injury is irreparable, and should be restrained. Bibby v. Bunch, 176 Ala. 585, 58 So. 916, Ann. Cas. 1918, ——.

[10] *Rule as to Balancing Injury.*—Defendant relies on the rule sometimes applied that courts will refuse an injunction when it will damage defendant more than it will benefit plaintiff, or more than plaintiff would be injured by its refusal. The principle is often applied in applications for temporary injunctions in suits to enjoin and account, especially where the right is in some doubt. Where the right and its breach are clear, the principle of balancing injuries does not apply. Loomis v. Collins, 272 Ill. 221, 111 N. E. 999; Wente v. Commonwealth Fuel Co., 232 Ill. 526, 532, 83 N. E. 1049. The rule is sometimes applied, also, when the benefit to plaintiff would be small and defendant's injury great. St. Louis Union Trust Co. v. Galloway Coal Co. (C. C.) 193 Fed. 106, 120; Stewart Wire Co. v. Lehigh Coal & Nav. Co., 203 Pa. 474, 53 Atl. 352. And in all cases, of course, the court will consider the comparative injury to the parties. Loomis v. Collins, 272 Ill. 221, 235, 111 N. E. 999. Other decisions illustrating the rule are Walters v. McElroy, 151 Pa. 549, 25

Atl. 125; Sullivan v. Jones & Laughlin Steel Co., 208 Pa. 540, 57 Atl. 1065, 66 L. R. A. 712; Harrington v. McCarthy, 169 Mass. 492, 48 N. E. 278, 61 Am. St. Rep. 298; Hodgkins v. Farrington, 150 Mass. 19, 22 N. E. 73, 5 L. R. A. 209, 15 Am. St. Rep. 168; and Kershishian v. Johnson, 210 Mass. 135, 96 N. E. 56, 36 L. R. A. (N. S.) 402.

The result of this suit may involve the abandonment of a valuable business on either side. Defendant will apparently be obliged to cease mining for many years if the decree goes against it. So, if there is no remedy by injunction, plaintiff may be compelled to cease mining forever in all parts of its territory north of the Vermillion river. That plaintiff is doing only what it is absolutely authorized by law to do cannot be denied. In a sense, also, defendant is proceeding lawfully. Its mining methods are correct and careful, and the deeds expressly authorize it to mine the coal if it can do so without injury to what lies above. This distinction, I think, makes the measure of the rights of the parties. It cannot so mine without letting down the earth above, and most seriously injuring the cement mine. In other words, plaintiff is acting strictly within its rights, while defendant, although doing the best it can, is unlawfully injuring the plaintiff in such a way as to preclude the probability of the future damage being capable of measurement. By analogy to the equitable maxim that where the equities are equal the law prevails, it may be said, in a general way, that while the right to injunction is not absolute, but in a sense discretionary, and whatever the decree the loser is bound to be greatly injured, perhaps equally injured, yet where plaintiff is strictly within its right, but defendant is not, equity should give effect to defendant's breach of plaintiff's legal right by letting down the rock ledge, and restrain such breach until the coal mining can proceed without injury.

[11] When each party is pursuing his own right, and collision results, the one without legal culpability of any kind must prevail, if the other occupies legally indefensible ground.

The form of decree submitted by plaintiff's counsel contains some provisions not here discussed, and is therefore appended.

*Decree.*—This cause came on to be heard by the court at this term upon the pleadings and the evidence, oral and documentary, offered in open court, and was argued by counsel, and thereupon, and upon consideration thereof, it was ordered, adjudged and decreed as follows:

1. That the complainant is a corporation organized under the laws of the state of Illinois and a citizen of that state; that the defendant is a corporation organized under the laws of the state of Wisconsin and a citizen of that state; that the amount in controversy in this case, exclusive of interest and costs, exceeds the sum and value of $3,000, and that this court has jurisdiction of the cause.

2. That the complainant is the owner in fee of the property referred to in the bill, and more particularly described in Exhibit A thereof, as follows: * * *; and that the source and date of its title thereto and of the interest of the defendant therein are correct-

ly stated in said Exhibit A; that the defendant owns the coal located in said premises, and known as geological seams Nos. 7, 5, and 2, and also known as the first, second, and third veins, and is entitled to mine and remove said coal only to the extent that this can be done without impairing the natural support which the coal in each of said veins furnished for complainant's property located above the same, and without causing the said property of complainant to subside; that the defendant has no right to impair the support furnished to the complainant by the said coal which the defendant owns, or to conduct any mining or other operations in either vein which will impair said support or cause the property of the complainant to subside; that no written agreement between the parties hereto or contained in any of the contracts or deeds in the chain of title of either party to any part of said property gave to the defendant the right to impair the natural support of the complainant's property, or to cause or to allow the property of the complainant, or any part thereof, to subside by reason of any operation of the defendant in connection with the mining of its said coal; that the defendant has the right to remove only so much of said coal as can be removed and leave complete and adequate support for the complainant's property, and such support as will prevent any subsidence of the complainant's property by reason of the defendant's mining operations; and that no agreement, oral or written, was made between the parties which gave to the defendant any other or greater right.

3. That the facts with reference to the character, value, and extent of the complainant's machinery, plant, outfit, and improvements upon said property, the extent and nature of its business, the character and value of its property for the purpose of conducting the manufacture of cement, the extent and nature of its mining operations, the necessary connection between its manufacturing plant and its cement mine, the value of the land for the purpose of such manufacture, and the consequences of any injury, either to the plant or to the mine caused by a subsidence of any part of the property, are correctly stated in the bill.

4. That the defendant has for some years been engaged in mining the coal in geological seam No. 2 (known also as the third vein), under a portion of the complainant's property, and in doing so has extracted all of the coal and a portion of the rock and other material above and below the coal in that vein, but has not supported the roof of the defendant's mine, or the complainant's property situated above said mine, nor prevented the subsidence of the complainant's property caused by the removal of said coal and other materials, either by the building of walls which gave such support or otherwise, but, on the contrary, has caused the property of the complainant to subside. During the trial of the case it was conceded on behalf of the defendant that its mining operations have caused such subsidence of some parts of the complainant's property to the extent of at least 20 inches.

5. That the subsidence of the complainant's property so caused by the defendant's mining operations, and the withdrawal of the natural

support furnished to the complainant's property by the said coal, extends continuously into the complainant's property as the mining operations of the defendant continue, is uneven and unequal in its action and effect; that it has caused, continues and will continue to cause, the roof, floor, and pillars in the complainant's said mine to crack, seams in the floor, roof and pillars to open, the roof of the rooms and passageways, from which limestone is being extracted in the complainant's said mine, to fall, and to place in great danger not only the lives of the complainant's workmen and its mining machinery used in conducting its business, but also the mine structure itself; that the effect of this subsidence will, if continued, riot only greatly increase the expense of continuing the complainant's business, and reduce the amount of limestone and other materials which it could otherwise reasonably obtain from its said mine, but will destroy the ability of the complainant to obtain from the mine a large amount of limestone and cement material which otherwise could be obtained, and will practically wreck a large and valuable portion of the complainant's property and greatly depreciate it in value; that such subsidence, if continued, will also greatly endanger complainant's manufacturing plant located upon its said property, for the safe and successful operation of which it is necessary that there be no disturbance of the soil underneath the foundations of the plant or any change in the level of the foundations thereof.

6. That the effect of this subsidence of the complainant's property thus caused by the defendant's mining operations has been and will continue to be injurious to the complainant, entailing upon it a very serious loss and the hazard of the destruction of its business and of the most valuable element of value in its property; but that it is impossible accurately to ascertain from time to time the exact amount of the damage so suffered, or for the complainant to enforce any remedy at law which will be adequate for the protection of its rights and interests as against the wrongful act of the defendant in causing the property of the complainant so to subside, and that the only remedy in any way adequate for the enforcement and protection of the complainant's rights is by an injunction as granted by this decree.

It is therefore ordered, adjudged, and decreed that the defendant, its agents, servants, and attorneys, be, and they are hereby perpetually enjoined from continuing to mine the coal or other materials underlying any part of the complainant's property described in the bill in such a manner as to cause or allow any part of the said property of the complainant to subside by reason of the withdrawal of the coal, and also from extracting said coal and other material without leaving and providing adequate support which will at all times prevent the soil and property of the complainant above said coal from subsiding, and also from impairing the natural support which said coal furnishes to the said land and property of the complainant.

It is further ordered, adjudged, and decreed that a writ of injunction issue restraining the defendant as herein provided, and that the complainant recover its costs against the defendant, to be taxed by the clerk, and that execution issue therefor in the usual manner.